**NATIONAL LABOR RELATIONS BOARD v. AMERICAN DIST. TEL. CO. OF PENNSYLVANIA.**

No. 10998.

United States Court of Appeals Third Circuit.

Argued May 4, 1953.

Decided June 8, 1953.

---

6. Section 3801(e) specifically prohibits an adjustment to be made as to any item which was not the subject of the error.

William Avrutis, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Frederick U. Reel, Washington, D. C., on the brief), for petitioner.

Frank L. Seamans, Pittsburgh, Pa. (J. S. Loynd, Smith, Buchanan, Ingersoll, Rodewald & Eckert, Pittsburgh, John H. Waters and William E. Seward, New York City, on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

## McLAUGHLIN, Circuit Judge.

The National Labor Relations Board petitions for the enforcement of its order dated July 14, 1952, to compel respondent to bargain with a union whose membership consists of guards and other employees of respondent.

The respondent, a Pennsylvania corporation, is one of a number of wholly owned subsidiaries of American District Telegraph Company, a New Jersey corporation, which in turn is controlled through majority stock ownership by Western Union Telegraph Company. Respondent, as do the other subsidiaries, supplies various forms of electric protective services by means of which the premises of its customers are safeguarded against burglary and fire. It operates in several cities of Pennsylvania, though the bargaining order deals solely with employees in the Pittsburgh area. The New York subsidiary acts as purchasing agent for the entire group and furnishes their equipment and supplies at cost. That corporation also performs important management functions for the others. In 1950 respondent paid the New Jersey holding company $95,251 for its share of those services.

Respondent has two departments, Plant and Operating. The former installs and maintains the protective equipment, the latter handles the alarm signals. Such signals are investigated by uniformed guards who wear badges and carry arms. The service is founded, among other things, upon the proposition that all alarm signals are answered immediately regardless of the

circumstances. It is part of respondent's contractual obligation to its subscribers that its guards, when necessary, remain on subscribers' premises until relieved.

## Jurisdiction

The Board urges that it possesses jurisdiction over respondent because of the latter's purchase of materials from outside Pennsylvania, the effect of its services upon subscribers engaged in interstate commerce and its association with the A.D.T. group.

For its complete operations respondent receives annually over $130,000 worth of material from outside of Pennsylvania. The Pittsburgh office is responsible for about $9,000 of that amount. Respondent argues that since its Pittsburgh employees are alone involved in this litigation any question regarding supply expenses should be confined to that unit. Using this theory it contends that the Pittsburgh expenses are in fact de minimis and cannot be reasonably adjudged to exert a substantial effect on interstate commerce as required by the pertinent law. NLRB v. Fainblatt, 1939, 306 U.S. 601, 607, 307 U.S. 609, 59 S. Ct. 668, 83 L.Ed. 1014; Mabee v. White Plains Publishing Co., 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607.

On the second point, while concededly respondent does furnish guard service in and around Pittsburgh to concerns engaged in interstate commerce, it argues that the nature of those services is remote, intermittent and non-essential and therefore that they are not substantially related to interstate commerce. With reference to respondent being one of a number of corporations comprising a multi-state business it is asserted that there is no proof to that effect.

We think that there is sufficient in each of the three reasons to justify the assumption of jurisdiction by the Board. There is nothing in the record to indicate that the Pittsburgh business was not the same kind as in the balance of respondent's territory and that it did not function as an integral part of the employer corporation. Pittsburgh supplies were merely a portion of

the total received by respondent. They were not intended for, or accepted by, any independent or separate project. Respondent's whole purchase system was attuned to the complete group buying plan as managed by the New York subsidiary. Incidentally, the cost of the interstate supplies for Pittsburgh amounted to the not inconsiderable proportion of approximately 8% of respondent's out-of-state purchases. The situation revealed is quite different from that existing in the type of case exemplified by NLRB v. Shawnee Milling Co., 10 Cir., 1950, 184 F.2d 57, 59, 23 A.L.R.2d 886, where a corporation operated " * * * two businesses, wholly separate and apart —one engaged in interstate business and the other in intrastate operations * * *." As in NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 685, 71 S.Ct. 943, 949, 95 L.Ed. 1284, "The maxim de minimis non curat lex does not require the Board to refuse to take jurisdiction of the instant case."

Admittedly respondent services a number of manufacturers and business houses engaged in interstate commerce. We cannot agree that its contact with those customers is intermittent and infrequent. On the contrary, there is a constant security supervision by respondent over the premises of its subscribers through an open, efficient alarm system which is the heart of respondent's enterprise. The alarms happily may be infrequent but the protection is continuous and paid for on that basis. The service rendered is, and has been, considered valuable enough by its subscribers to have enabled this corporation, its fellow subsidiaries and its parent New Jersey corporation, to develop appreciably even for this time and place. While the Pittsburgh operation is not of the importance to its interstate commerce subscribers that the Consolidated Edison Company was in its dispute with the National Labor Relations Board [Consolidated Edison Co. v. NLRB], 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, the protection furnished is close enough to the reach of that decision to prevent us from denying the Board's jurisdiction on this ground.

The Board's theory of multi-state operation also possesses considerable justification. We have here a parent controlling corporation with its corporate subsidiaries in various states. It is stipulated between the parties that "certain specialized management functions [of those subsidiaries, including respondent] i. e. administrative, accounting, auditing, advertising, engineering, financial and legal services * * *. are not performed by the subsidiaries but by the New York company for which services the New Jersey holding company is paid." We think that the close integration of ownership and operation of respondent with the entire A.D.T. group actively engaged in the identical sort of business in several states effectively removes respondent " * * * from the realm of purely local enterprise." Collins Baking Co. v. NLRB, 5 Cir. 1951, 193 F.2d 483, 485.

### Appropriate Bargaining Unit

Under its present ruling the Labor Board combines both classes of respondent's employees, operators and guards, into one union. Section 9(b) of the National Labor Relations Act, 29 U.S.C.A. § 159(b), outlines the method to be used by the Board in determining the appropriate bargaining unit for employees. It specifically provides:

"That the Board shall not * * * (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards."

In three decisions wherein companion subsidiaries of respondent were the employers the Board held that 9(b) (3) applied to guards similar to respondent's who protected property which did not belong to their

own employer.[1] In the first of those opinions the Board additionally concluded that such meaning was the self-evident intention of Congress in enacting the section. The opinion stated that "Clearly, this Board would be thwarting instead of implementing the intent of the Congress if it adopted a rule under which a labor organization that represented nonguards could also be certified as a bargaining representative for guards, simply because those guards protected property which did not belong to their own employer." American District Telegraph Company, 83 N.L.R.B. 517, 520.

Since respondent's guards unquestionably do some actual guard duty on customers' premises and are available for that service on a 'round the clock schedule, the fundamental query must be whether the controlling section limits its conception of a guard to one who guards the premises of his own employer, as is now asserted by the Board. It is difficult to obtain that result from the language of the statute which states that the guard to whom it refers is one who enforces rules to protect the property of *the* employer—not *his* employer, as the Board would have it read. These rules are enforced "against employees and other persons", not against *fellow employees*. Furthermore, the duties of a guard who comes within 9(b) (3) include the protection of "the safety of persons on *the* [not *his*] employer's premises". (Emphasis supplied.) Significantly in this connection section 2(3) of the Act states that "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise".

With reference to the protection afforded by enforcing rules not only against the employer's employees but against "other persons", in C. W. Hill, 76 N.L.R.B. 158 (1948), the Board held that 9(b) (3) even applied to watchmen who did not monitor anybody's employees. In its report for that year, the Board, explaining its position, said, "This is because watchmen normally have a duty to protect their employ-

er's property against theft, whether by employees or 'other persons' who might gain access to the employer's premises." In Young Patrol Service, 75 N.L.R.B. 404 (1947), watchmen and guards were furnished by an independent contractor chiefly for the purpose of guarding subscribers' property against fire and theft and for enforcement of rules against employees and other persons. The Board decided that those watchmen and guards came under section 9(b) and should not be members of a union which admitted to its membership employees other than guards.

The Board's principal argument in favor of including respondent's guards with its other employees in a bargaining unit is that if the guards were recognized as within the 9(b) (3) proviso they might find themselves in the same union as guards of an employer to whose property they were assigned, with the result that a question of divided loyalty could arise. Though the Board suggests that Congress never intended that eventuality no reference is made to supporting legislative history. Actually what Congress was seriously concerned with at the time was to prevent guards from joining a production workers union and in that way creating possible split allegiance. The situation arose because of the Supreme Court decision in NLRB v. Jones & Laughlin Steel Corporation, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575, which allowed an employer's plant guards and its production and maintenance employees to be members of the same bargaining unit. That opinion had reversed the decision of the Sixth Circuit, 1946, 154 F.2d 932 at page 935, which had held: "In case of industrial unrest and strikes on the part of the production employees, the obligations of the plant guards to the municipality and state would be incompatible with their obligations to the Union which, since it represents production employees, authorizes and directs the strike." The favorable impression made upon the Congress by that reasoning resulted in the insertion of section 9(b) (3) into the Act. Legislative his-

1. American District Telegraph Company (Los Angeles), 83 N.L.R.B. 517 (1949); American District Telegraph Company (St. Louis), 83 N.L.R.B. 1139 (1949); American District Telegraph Company (Detroit), 84 N.L.R.B. 162 (1949).

tory of the Act page 1541. Senate June 5, 1947, Congressional Record, p. 6601. In American District Telegraph Company, 83 N.L.R.B. 517, 520, the Board recognized that the history of the section gave no evidence of intention to draw a distinction between " * * * plant guards hired directly by the employer and plant guards who are employed by a guard service." See also the Board's 1949 report, pages 38–39.

By advocating its so-called divided loyalty theory and under it permitting guards to join a production employees union the Board runs head on into a far more serious and very real problem in that category. In the event of an alarm from a strike bound subscribing plant respondent's guards might be forced to cross a picket line of their fellow unionists in order to fulfill the primary obligation of both their employer and of themselves as guard employees. The Board argues at some length against the probability of that sort of incident taking place. It fails to dispose of the problem satisfactorily. If the Board could visualize such situation it does seem that it would then be forced to concede that 9(b) (3) would effectually prevent its occurrence. Testimony in this record shows it could happen. The union representative indicated that if the particular union directed respondent's guards to observe the picket line it would expect compliance with that order. The constitution of the union in evidence, and under which members are required to obey all lawful orders of the Executive Board, corroborates this view.

The Board also questions the guard status of respondent's employees so designated. The point is unsubstantial. Respondent's guards are not performing constant guard duty on subscribers' premises but they do so in the ordinary course of their work when the occasion requires. That they are always held ready to perform that special branch of their duties is not only a major element of their employment but a large factor in the successful conduct of the business of respondent.

Under all the circumstances it would seem more appropriate for the Board to present its current views on 9(b) (3) to the Congress rather than strive for this new restrictive interpretation of the statute which is of doubtful authority and questionable practical value.

The petition for enforcement will be denied. Form of decree to be submitted.