533 F.2d 121
 92 L.R.R.M. (BNA) 2009, 78 Lab.Cas. P 11,367
 WELLS FARGO ALARM SERVICES, a Division of Baker Industries,
Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Electrical, Radio and Machine Workers of America
(UE), Intervenor.
 No. 75-1670.
 United States Court of Appeals,
Third Circuit.
 Argued March 9, 1976.
Decided April 7, 1976.
 
 Matthew J. Broderick and Gregory D. Keeney, Dechert Price & Rhoads, Philadelphia, Pa., for petitioner.
 John S. Irving, Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John Ferguson and Alfred Norek, Attys., N. L. R. B., Washington, D. C., for respondent.
 Robert Z. Lewis, Frank J. Donner, and James G. Mauro, Jr., New York City, for intervenor.
 Before KALODNER, VAN DUSEN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This case is before us on a petition for review and cross-application for enforcement of an order of the National Labor Relations Board. By decision and order dated May 29, 1975, the Board found Wells Fargo Alarm Services, petitioner here, to be violating §§ 8(a)(5) and 8(a)(1) of the NLRA[1] by refusing to bargain with the United Electrical, Radio & Machine Workers of America (UE) as the exclusive bargaining representative of all employees in a unit determined to be "appropriate" within the meaning of § 9.[2] Wells Fargo Alarm Services, 218 NLRB No. 25 (1975). We grant the application for enforcement of the Board's order and deny the petition for review.
 
 
 2
 Wells Fargo challenges the Board's order on the ground that the unit represented by UE includes guards and, therefore, is not "appropriate" under the terms of the proviso to § 9(b):
 
 
 3
 ". . . the Board shall not . . . (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards."
 
 
 4
 This contention was raised by Wells Fargo in a representation proceeding, Case 4-RC-11066, which culminated on September 30, 1974, in certification of UE as the sole collective bargaining agent for the employees in the challenged unit. During the unfair labor practice proceeding, the Board relied on its previous disposition of this contention made at the representation proceeding.[3] The unit found appropriate by the Board is "All production and maintenance employees including servicemen, installers and central office operators, but excluding salesmen, office clerical employees and supervisors as defined in the Act."[4] Since judicial review of the Board's unit determinations is not available, the instant case provides Wells Fargo with its first opportunity to present its contention to a court that the unit is inappropriate.[5]
 
 
 5
 Wells Fargo is engaged in the business of providing protective services by maintaining and servicing fire, burglar and industrial process alarms to subscribers, including banks, warehouses, retail stores, and manufacturing plants. Wells Fargo does not contend that the installers, who are solely concerned with installing the electronic alarms on the premises of subscribers, are guards, but it does urge that the servicemen and the operators are and that, therefore, they should not be included in the same unit as the installers. Servicemen, who are on duty 24 hours a day, are responsible for the routine servicing of the alarm devices and are usually dispatched to the scene of an alarm. Central office operators monitor the signals coming into the central office from the alarm systems. When an alarm signal is received, it is the duty of the operators to summon the police or fire department to the scene, to notify the subscriber, and to dispatch a serviceman to the place from which the alarm originates.
 
 
 6
 We turn to an evaluation of the evidence in order to determine if the Board applied the appropriate legal standards and if its findings are supported by substantial evidence on the record considered as a whole. The heart of the findings made in the representation proceeding concerning the serviceman is as follows:
 
 
 7
 "In burglar or fire alarm situations, the police or fire departments are always dispatched to the scene first by the central office and then a serviceman is dispatched. In about 10% of all burglar alarms, the serviceman arrives before the police. When a serviceman arrives at the scene of a burglar alarm, he usually waits for the police to arrive before taking any action other than looking for signs of forcible entry. When the police arrive, he lets them into the premises and accompanies them on their search. The serviceman is not required to search for burglars himself. If a subscriber is coming to the premises, he waits for the subscriber and when the subscriber arrives, makes sure he has the proper Wells Fargo identification number before he is allowed entry. However, the serviceman is not required forcibly to restrain an individual from entering the premises if he lacks proper identification. Lastly, the serviceman makes whatever repairs are necessary to put the alarm back into working order.
 
 
 8
 "In fire alarm situations, the serviceman is dispatched to the scene but is not required to assist in putting out the fire if there is one. His job is to repair the alarm if it has malfunctioned, or put it back into service if there has actually been a fire.
 
 
 9
 "In considering the record as a whole, I am not persuaded that servicemen are guards within the meaning of the Act. Their primary function is the repair and servicing of alarm systems. Although they do respond to fire and burglar alarms, it is not their duty to search for intruders nor to restrain persons from entering the subscriber's premises, but to get the alarm back into working order. Nor are the servicemen usually armed. Accordingly, I shall include them in the unit."
 
 
 10
 App. at 154a-155a.
 
 
 11
 We have found no error in the Board's interpretation of the term " guard" as used in § 9(b)(3). It seems clear that the Board recognized the fundamental proposition that § 9(b)(3) "is not limited to guards employed to protect property belonging to their own employer or to guards who protect against the conduct of fellow employees." American Dist. Tel. Co. of the Cleveland Co., 160 NLRB 1130, 1136 (1966) (emphasis in original). As we said more than 20 years ago, "what Congress was seriously concerned with at the time was to prevent guards from joining a production workers union and in that way creating possible split allegiance." NLRB v. American Dist. Tel. Co. of Pa., 205 F.2d 86, 89 (3d Cir. 1953).
 
 
 12
 We agree with Wells Fargo that the determination of whether an employee is a "guard" cannot be based on a mechanical checklist. We part company with the petitioner where it asserts that the determination must be made on the basis of the functional role of the employee utilizing modern technology. An employee may have an integral role in a protective system but not function as a "guard" as that term is used in § 9(b)(3).[6] See American Dist. Tel. Co. of Cleveland Co., supra at 1138.
 
 
 13
 The legislative history makes plain that the content of § 9(b)(3) owes much to the reasoning of the Sixth Circuit in NLRB v. Jones & Laughlin Steel Corp., 154 F.2d 932 (1946), reversed, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947). See II Legislative History of the Labor Management Relations Act, 1947, at 1541 (1948) (remarks of Senator Taft). In the Jones & Laughlin case, the court was greatly concerned about the danger of guards having conflicting obligations to their union and to their employer in the event that (1) guards were permitted to join a production workers union, and (2) there should be a strike. This same type of concern was reflected in our case of NLRB v. American Dist. Tel. Co. of Pa., supra at 90:
 
 
 14
 "In the event of an alarm from a strike bound subscribing plant (the company's) guards might be forced to cross a picket line of their fellow unionists in order to fulfill the primary obligation of both their employer and of themselves as guard employees. . . . The union representative indicated that if the particular union directed respondent's guards to observe the picket line it would expect compliance with that order."
 
 
 15
 To determine whether an employee is a "guard," the Board's inquiry must focus on whether the potential conflict in loyalties which concerned Congress is present. To be a guard, therefore, the employee must be obligated to enforce plant protection rules against employees and other persons. See United States Gypsum Co., 152 NLRB 624, 627-28 (1965). Only when this element of potential personal confrontation is present in the employee's duty to protect the employer's property is that employee a "guard." This determination requires a weighing of relevant factors and is essentially a factual one, see NLRB v. Paper Art Co., 430 F.2d 82, 84 (7th Cir. 1970), and there is substantial evidence to support the Board's findings on this issue. See page 125 below.
 
 
 16
 In light of these considerations, the findings made in the representation proceeding adequately support the conclusion that the servicemen are not guards. We read the decision in the representation proceeding as holding that police, rather than the servicemen, are used "to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises . . . ." 29 U.S.C. § 159(b)(3).[7]
 
 
 17
 Wells Fargo contends that several of the findings made in the representation proceeding are not supported by substantial evidence in the record as a whole. It was found that the primary function of the servicemen is to repair and service the alarm systems of subscribers. Wells Fargo contends that this finding ignores the fact that a substantial portion of calls in the second and third shifts were alarm calls. There is evidence in the record, however, indicating that approximately 99% of burglar alarms do not involve actual entry to the protected premises. App. at 91a-93a. See also App. at 95a-96a. It was also found that it is not a serviceman's duty to search for intruders nor restrain persons from entering the subscriber's premises.
 
 
 18
 We have concluded that substantial evidence on the record amply supports these findings. See App. at 34a-37a, 45a-47a, 90a. Moreover, in over 90% of the cases, the police arrive at the premises before the serviceman reaches this destination (93a-94a, 154a).
 
 
 19
 The petition for review will be denied, and the order of the National Labor Relations Board will be enforced.
 
 
 
 [1]
 29 U.S.C. § 158 provides:
 "(a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (5) to refuse to bargain collectively with representatives of his employees, subject to the provisions of section 159(a) of this title."
 29 U.S.C. § 159(a) provides:
 "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . ."
 (Emphasis supplied.)
 
 
 [2]
 29 U.S.C. § 159
 
 
 [3]
 The Board delegated its powers in connection with the representation proceeding to the Acting Regional Director of Region Four. See 29 U.S.C. § 153(b); Magnesium Casting Co. v. N. L. R. B., 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971). His opinion on the appropriateness of the challenged unit was issued August 23, 1974, and it is reprinted in the appendix at 153a. Furthermore, the Board pointed out in its decision (160a):
 "All issues raised by the Respondent in this proceeding were or could have been litigated in the prior representation proceeding, and the Respondent does not offer to adduce at a hearing any newly discovered or previously unavailable evidence, nor does it allege that any special circumstances exist herein which would require the Board to reexamine the decision made in the representation proceeding."
 
 
 [4]
 Decision and Direction of Election, Case 4-RC-11066, App. at 153a (August 23, 1974). For an excellent general discussion of the Board's choice of an appropriate unit pursuant to 29 U.S.C. § 159, see B. Meltzer, Labor Law 290 (1970)
 
 
 [5]
 Magnesium Casting Co. v. NLRB, 401 U.S. 137, 139, 91 S.Ct. 599, 600, 27 L.Ed.2d 735, 737 (1971). But cf. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) (district court has jurisdiction to set aside unit determination made in excess of Board's powers)
 
 
 [6]
 Petitioner contends that the central office operators are "functional equivalents" to guards, and therefore the Board committed error by including them in the same unit as the installers and by permitting them to be represented by UE. Since we reject this description of the operators as a basis for a finding of guard status within the meaning of § 9(b)(3), and since, under recognized standards, the operators cannot be called guards, we hold that they are not "guards" as that term is used in § 9(b)(3). See NLRB v. American Dist. Tel. Co. of Pa., supra at 88; American Dist. Tel. Co. of the Cleveland Co., supra at 1138
 
 
 [7]
 Wells Fargo contends that this holding is inconsistent with at least two previous decisions. There are striking similarities between the instant case and A. D. T. Co., 112 NLRB 80 (1955). The A. D. T. case was distinguished on two grounds in the Decision and Direction of Election: (1) all the employees in A.D.T. were armed, and (2) those employees patrolled the premises of the subscribers if a watchman became incapacitated or if electrical service were interrupted. App. at 154a-155a. The Board has conceded that servicemen who go out on runs during the second and third shifts generally do carry guns. But see App. at 36a-37a (testimony indicating that it is a matter of personal choice whether a serviceman carries a gun). Moreover, the practice of not carrying a gun certainly does not preclude an employee from being a guard within the meaning of § 9(b)(3). See Beyerl Chevrolet, Inc., 199 NLRB 120, 121-22 (1972). The second distinction has more force. It goes to the crucial question of whether there is potential for personal confrontation in the employee's duty to protect the employer's property
 American Dist. Tel. Co. of the Cleveland Co., 160 NLRB 1130 (1966), is much more readily distinguishable. As was pointed out in the Decision and Direction of Election:
 "(T)he police were only called in 50-60% of the burglar alarm cases, whereas in the instant case police are called 100% of the time, and only on rare occasions do they fail to appear at the scene. Moreover, the servicemen in the latter case were required as part of their job function to detain intruders on subscriber's premises, a duty which is altogether absent with Employer's servicemen."
 App. at 155a.
 Since the servicemen were authorized to effect an arrest in New Orleans but not in Philadelphia, the decision in the representation proceeding there (Wells Fargo Alarm Services (New Orleans ) 15 RC-5604 (2/3/75)) is distinguishable from this proceeding. We note that the above decision preceded the General Counsel's motion for summary judgment on 2/21/75 and respondent's answer to such motion filed on 3/14/75.