INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL 344, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

Purolator Security, Inc., Intervenor.

No. 77–1413.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1977.

Decided Dec. 15, 1977.

As Amended Jan. 18, 1978.

SPRECHER, Circuit Judge.

At issue in this appeal is the statutory and constitutional validity of the National Labor Relations Board's (NLRB) determination that it is an unfair labor practice for a union composed of guard and non-guard employees to picket in order to force an employer to recognize that union as the bargaining agent for a unit of driver-guard employees.

I

This case arises on a petition of the International Brotherhood of Teamsters, Local 344 (the Union) to set aside a decision of the NLRB, 228 NLRB No. 172 (Apr. 12, 1977), ordering the Union to cease and desist from picketing Purolator Security, Inc. (Purolator or employer) in violation of section 8(b)(7)(C) of the National Labor Relations Act, 29 U.S.C. § 158(b)(7)(C). The Board has filed a cross-application requesting this court to enforce its order. The court's jurisdiction is based on sections 10(e) and (f) of the NLRA, 29 U.S.C. § 160(e), (f).

Purolator, a Texas corporation, provides armored car services for customers in the metropolitan Milwaukee, Wisconsin area. Its employees there pick up and deliver money, cash receipts, daily receipts, securities and valuable personal property for its customers. The general procedure is for the driver of a Purolator truck to stop at a customer's location and remain in the truck. A fellow driver-guard picks up the package from the customer and signs a receipt. The two driver-guards deliver the package to its designated destination and obtain a receipt for the delivery. On a typical route the total items picked up during a run will value as much as $2 to $3 million.

Purolator employs in Milwaukee ten full-time driver-guards, ten part-time driver-guards, one mechanic who occasionally drives and a vault man. All driver-guards

Kenneth R. Loebel, Milwaukee, Wis., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, John G. Elligers, Joseph P. Norelli, Attys., N.L.R.B., Washington, D. C., Harry Sangerman, Chicago, Ill., for respondent.

Before SPRECHER and TONE, Circuit Judges, and GRANT, Senior District Judge.*

---

* Senior District Judge Robert A. Grant, of the United States District Court for the Northern District of Indiana, is sitting by designation.

wear uniforms, insignias and shields indicating that they are employees of Purolator and they carry firearms issued by Purolator. Although the employees are not deputized, they carry their guns to protect the customer's property, to protect themselves against possible assault and to deter attacks.

Purolator is responsible for any losses caused by its employees. It carries insurance against loss of cargo up to $50 million and for injuries caused by its employees up to some unspecified amount.

On July 28, 1976, the Union notified Purolator that it had been authorized by a majority of the employees at Purolator's Milwaukee facility to represent them for purposes of collective bargaining. Purolator did not respond and so the Union filed a petition on July 30 with the NLRB seeking an election in a unit of "all driver guards, driver messengers, guard messengers, and mechanics."

The Acting Regional Director dismissed the petition on August 4. He decided that the employees were "guards" within the meaning of section 9(b)(3) of the NLRA (quoted in text *infra*); and since the Union admits to membership employees other than guards, he concluded that the Board was barred by that provision from certifying an election with that Union. The Union requested the Board to review the Acting Director's decision to dismiss its petition. The Board, with one member dissenting, affirmed the Director's decision.

Subsequent to the Acting Regional Director's decision but prior to the Board's affirmance, the Union again contacted Purolator asking it to recognize the Union as the bargaining representative of the driver-guards, and offering to prove its majority status either through signed authorization cards or a secret election. The Union also threatened that if Purolator did not accept the Union as the bargaining representative of the driver-guards, then the Union would engage in peaceful picketing to publicize the dispute with the employer.

On September 21, 1976, the Union picketed the premises of Purolator in Milwaukee and distributed handbills to passers-by explaining that Purolator refused to recognize the Union. On September 22, 23 and 29, the Union engaged in ambulatory picketing and handbilling of Purolator at the premises of some of its customers at times when Purolator's vehicles were present at those locations.

The Regional Director filed a complaint on September 22, 1976, alleging that the Union's picketing violated section 8(b)(7)(C) of the National Labor Relations Act (quoted in note 1 *infra*). The case was tried before an Administrative Law Judge who held that the Union's conduct did constitute an unfair labor practice and ordered the Union, *inter alia,* to cease and desist from picketing the employer. A three member panel of the Board, with one member dissenting, affirmed the ALJ's decision and adopted his recommended Order. The Union now appeals that decision.

## II

The Board's theory in this case is that Congress in section 8(b)(7)(C) [1] by its reference to picketing for a reasonable period of time up to thirty days prior to the filing of a petition under section 9(c) [2] intended by

---

1. Section 8(b)(7)(C) makes it an unfair labor practice for a union

   to picket . . . any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees . . ., unless such labor organization is currently certified as the representative of such employees:

   \* \* \* \* \* \*

   (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable peri-

od of time not to exceed thirty days from the commencement of such picketing. . . .
29 U.S.C. § 158(b)(7)(C).

2. That section specifies the procedures leading up to a Board-conducted election. It provides, in relevant part, as follows:

   Whenever a petition shall have been filed, . . . the Board shall investigate such petition and . . . shall provide for an appropriate hearing upon due notice. . . .
   If the Board finds upon the record of such hearing that such a question of representa-

implication to forbid all subsequent recognitional picketing if the Board determines that it cannot or will not hold a representation election. Since the Board decided that section 9(b)(3) restricts it from certifying these driver-guards in a unit to be represented by a union with non-guard members, it concluded that the Union was forbidden after the Acting Regional Director's certification decision from engaging in recognitional picketing. This theory has been approved, with one judge dissenting, by the District of Columbia Circuit in *Drivers, Chauffeurs, Warehousemen & Helpers Local 71 v. NLRB,* 553 F.2d 1368 (D.C.Cir. 1977) (*Wells Fargo*).[3]

The Union in this appeal presents several arguments for reversing the NLRB's determination that the Union committed an unfair labor practice. First, the Union contends that the driver-guard employees of Purolator are not "guards" within the meaning of section 9(b)(3) of the NLRA, 29 U.S.C. § 159(b)(3). That section provides:

The Board shall decide in each case . . . in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining. . . . *Provided,* That the Board shall not

\*   \*   \*   \*   \*   \*

(3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a *guard* to enforce against em-

ployees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than *guards.*

(Emphasis added).

The Union argues that since the employer's driver-guards are not "guards" for purposes of section 9 the Board erred in not certifying immediately the driver-guard unit and holding an election. Although we recognize that the propriety of the Board's interpretation of section 9 is not beyond dispute, we still decline to overturn it. *See Humphrey v. Drivers, Chauffeurs & Helpers Local 639,* 369 F.Supp. 730, 735 n. 15 (D.Md.1974).

It is important to recognize that we are not being asked to review a new Board interpretation. Since 1953, the NLRB in the few cases in which the issue has arisen has consistently ruled that driver-guards such as those at Purolator are "guards" under 9(b)(3).[4] *Armored Motor Service Co.,* 106 N.L.R.B. 1139 (1953); *Drivers, Chauffeurs, Warehousemen & Helpers Local 71,* 221 N.L.R.B. 1240, *enforced,* 553 F.2d 1368 (D.C.Cir.1977); *Drivers, Chauffeurs & Helpers Local 639,* 211 N.L.R.B. 686 (1974).

---

tion exists, it shall direct an election by secret ballot and shall certify the results thereof.

29 U.S.C. § 159(c)(1).

**3.** The substantiality, but not the ultimate correctness, of the Board's theory was before us when the petitioner Union appealed from a preliminary injunction under § 10(*l*) of the Act, 29 U.S.C. § 160(*l*). *Squillacote v. Int'l Brotherhood of Teamsters Local 344,* 561 F.2d 31 (7th Cir. 1977). Similar issues have been considered by other courts in cases involving the appropriateness of a preliminary injunction under § 10(*l*). *See Humphrey v. Drivers, Chauffeurs & Helpers Local 639,* 369 F.Supp. 730, 735 n.15 (D.Md.1974); *McLeod v. Security Guards & Watchmen Local 803,* 333 F.Supp. 768 (S.D.N.Y.1971).

**4.** Before 1953, the Board held a contrary view. Soon after § 9(b)(3) was passed by Congress, the Board decided that a driver-guard unit was *not* barred from certification to be represented by a union with non-guard members. *Brink's, Inc.,* 77 NLRB 1182 (1948). In so holding the Board relied primarily on the legislative history of the 1947 amendments to the NLRA which emphasized the problem created by divided loyalties in employees responsible for preventing disorders and reporting misconduct of unions and their members. *Id.* at 1185 (quoting H.R.Rep.No.245, 80th Cong., 1st Sess. 16 (1947)). Since driver-guards were not responsible primarily for reporting on unions and their members, the Board concluded that they could safely be included in units with other non-guard employees.

In so holding the Board in *Armored Motor Service* initially determined that one of the policies that underlay Congress' decision to treat guards differently from other employees was a general concern for the problem of divided loyalties in employees primarily responsible for the protection of the employer's property. Then the Board, based presumably upon its expertise, found that "[t]he danger of divided loyalty which Congress sought to eliminate may not be quite so far-reaching in the case of armored-car guards, but it is nevertheless, present." *Armored Motor Service, supra* at 1140.

In reviewing the Board's decision in this case, we can consider the two parts of the Board's *Armored Motor Service* analysis separately. First, we are of the opinion that there is support in the language of the Act and in its legislative history [5] for the Board's view of the policy to be advanced by section 9(b)(3)'s treatment of "guards." It would seem that the language of the Act referring to guards as "individual[s] employed . . . to enforce against employees and other persons rules to protect *property* of the employer . . ." (emphasis added) demonstrates a congressional concern for divided loyalties in employees given the particularly sensitive task of protecting the employer's property.[6]

Second, we believe that the Board could reasonably conclude that the problem of divided loyalty is relevant to the driver-guard situation. *See Wells Fargo, supra* at 1374. In support of its view, the Board cited the following example:

A conflict of loyalty could arise, for example, if the guards should be called upon to deliver money or valuables to one of their customers whose employees were represented by the same union as represented the armored-car guards and the employees of the customer were on strike and picketing the premises of the customer.

*Armored Motor Service Co.,* 106 N.L.R.B. 1139, 1140 (1953). We agree with the District of Columbia Circuit that the Board could reasonably determine that this is a type of divided loyalty that Congress sought to avoid in section 9(b)(3). We therefore decline to hold that the Board's interpretation is in error.

### III

Next, the Union argues that even if section 9(b)(3) does forbid the Board from certifying the Union as the representative of this unit it should nevertheless have held an election for the employees in the unit and certified the arithmetical results.[7] In

---

**5.** The Conference Committee Report essentially tracks the language of § 9(b)(3), including a reference to the employer's property in its explanation for the inclusion of that provision. The Report describes "guards" as "any individual employed as a guard to enforce against employees and other persons rules to protect property belonging to the employer or for which the employer is responsible . . . .." H.R.Rep.No.510, 80th Cong., 1st Sess. 48 (1947), U.S.Code Cong.Serv. 1947, p. 1153.

**6.** The reference to the "property of the employer" has been used by a circuit court and the Board to support the position that employees of one company who are hired out to protect the property of a different company are still "guards" within the meaning of § 9(b)(3). *See NLRB v. American Dist. Tel. Co. of Pa.,* 205 F.2d 86, 89 (3d Cir. 1953); *American Dist. Tel. Co.,* 160 N.L.R.B. 1130, 1136–37 (1966); *Potter Elec. Signal Co.,* 149 N.L.R.B. 373 (1964). The relevance of those cases to our issue is attenuated since they deal with plant guards. The

dominant policy statements in the legislative history dealing with "[p]lant policemen and guards [who] prevent disorders and report misconduct of employees" applies with full force to this situation. H.R.Rep.No.245, 80th Cong., 1st Sess. 16 (1947). *See also* 93 Cong.Rec. 6601, 6603, 6658 (remarks of Senators Taft and Murray). Thus, unlike the District of Columbia Circuit, we do not believe that a contrary result in our case would *"sub silentio"* overrule Board decisions declining to read § 9(b)(3) narrowly. *Wells Fargo, supra* at 1373 n.11.

**7.** The Union in this regard also argues that the Board's decision exceeded its statutory authority because nothing in the Act gives the Board the authority to decline to hold an election merely because it lacks the power to certify a unit. This argument is without merit. The Board has the authority to investigate all petitions for elections and determine whether "a question of representation affecting commerce exists." 29 U.S.C. § 159(c)(1). The Board determined that since it was barred under

the Union's view had an election been held in which a majority of the employees had voted for the Union, its recognitional picketing would not have been an unfair labor practice under section 8(b)(7)(C). While this view is not without some substance given the policy underlying that provision,[8] we hold that the Board was not required to hold an election and thus we decline to consider whether the Union's theory is correct.

■ The Board apparently does have the power to conduct an election in which non-qualifying unions appear on the ballot. *See Burns Int'l Detective Agency, Inc.*, 138 N.L. R.B. 449 (1962); *Rock-Hills-Uris, Inc. v. McLeod*, 236 F.Supp. 395, 398 (S.D.N.Y. 1964), *aff'd per curiam*, 344 F.2d 697 (2d Cir. 1965); M. Forkosch, A Treatise On Labor Law § 320 (1965). However, the decision whether to conduct an election in any given situation is in the Board's discretion. *Wells Fargo, supra*, 553 F.2d 1376; *Rock-Hills-Uris, Inc., supra*, 236 F.Supp. at 398.

Although we recognize that a Board-conducted election might provide a better indication of the majority will of the employees and thereby promote stable labor relations, 236 F.Supp. at 398, we note that an election is a substantial expense both to the employer and to the Board. 553 F.2d at 1376. The Board is in the best position to decide whether the benefits from the election justify the expense. We cannot say that the Board in declining to hold an election in this case abused its discretion.[9]

## IV

The Union argues that even if the Board correctly interpreted section 9(b)(3) and properly used its discretion in declining to hold an election, the Board nevertheless erred in holding that the Union's picketing was an unfair labor practice in violation of section 8(b)(7)(C). The Union reasons that all that the Act does is deprive it of the Board's power to compel the employer to bargain with it even though a majority of the employees might wish to be represented by the Union. Since nothing in the Act forbids the employer from voluntarily recognizing the Union as the bargaining representative, the Union concludes that it should be able to employ economic pressure to attain that status. In this conclusion the Union relies primarily on *United Mine Workers v. Arkansas Oak Flooring Co.*, 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956);[10] *Rock-Hills-Uris, Inc. v. McLeod*, 236 F.Supp. 395 (S.D.N.Y.1964), *aff'd per curiam*, 344 F.2d 697 (2d Cir. 1965);[11] and *Vila Barr*,

§ 9(b)(3) from certifying this union as the bargaining agent of these employees that no question of representation existed. That determination plainly was within the Board's statutory authority.

8. *See* the discussion of the policy underlying § 8(b)(7)(C) in Parts IV and VI of this opinion *infra*.

9. It is possible that the Union has already waived this argument by never raising it before the Board when it appealed the Acting Regional Director's decision not to hold an election on the basis that these driver-guards fell within the prohibition in § 9(b)(3). It is also possible that the Board would have acted differently if the issue of holding an election had been presented in terms of the Board's discretion. Certainly, the Union would have benefited by making a record on this issue for this appeal.

10. *Arkansas Flooring* dealt with whether a state could outlaw recognitional picketing when the Union was forbidden, for failing to provide anti-communist affidavits, from employing the Board's recognitional processes. The Court held that, notwithstanding the ban on the Board's power, the state could not forbid that picketing. In part the case was decided on the basis of federal preemption since the union was still subject to the Board's general jurisdiction. 351 U.S. at 75, 76 S.Ct. 559. Yet, even the pro-picketing language in that decision cited by the Union must be read in light of the fact that § 8(b)(7)(C) had not yet been passed. In fact, the Court specially noted that "[p]resent law in no way limits the primary strike for recognition." *Id.* at 75 n.14, 76 S.Ct. at 567. Thus, *Arkansas Flooring* has no effect on our case.

11. In *Rock-Hills-Uris*, the district court was asked to consider whether the Board could include two non-guard unions on a recognitional election ballot for a unit of guards in light of § 9(b)(3)'s ban on certification. The court upheld the Board's use of discretion in including the two unions. In so holding, the court in dicta and with a citation only to *Arkansas Flooring* stated that "the employer may volun-

157 N.L.R.B. 588 (1966).[12]

■ While it is not altogether clear how Congress intended section 8(b)(7)(C) to apply to these facts, we conclude that that provision bars recognitional picketing after it is determined that no Board-conducted election will be held. That conclusion is supported by the language of the provision and by the policies underlying it.

The provision itself refers to a petition under section 159(c) which is the initial step in the Board-conducted election process. We believe that the District of Columbia Circuit accurately read the import of that provision when it held: "8(b)(7)(C) . . appears to contemplate picketing by way of prelude to an election." Thus, absent the possibility of an election,[13] recognitional picketing would appear to be proscribed. 553 F.2d at 1377.

There appear to be two policies served by section 8(b)(7)(C) which could be undermined by the Union's interpretation. First, the Act's preference for elections supports a policy favoring the orderly settlement of labor disputes. *NLRB v. Local 542, Int'l Union of Operating Eng.*, 331 F.2d 99, 107

(3d Cir.), *cert. denied*, 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964) (quoting the Board decision under review). Nothing could be less orderly or give rise to more serious unrest than to interpret 8(b)(7)(C) to permit this union to engage in representational picketing for an indefinite period of time.

Second, the ban on recognitional picketing was significantly motivated by a desire to end the union practice of going into an employer's office without any concern for the sentiments of the majority of the employees and threatening to engage in picketing indefinitely unless the employer recognized the union as the bargaining representative of the employees. Indicative of Congress' view of this provision was Representative Smith's remark in arguing that a provision comparable to 8(b)(7)(C) was needed to supplement subsections (A) and (B):

This leaves untouched the area where the real trouble is, namely, where a union by coercive methods and picketing puts pressure on both employer and employees to recognize a union that the employees oppose and do not want.

---

tarily recognize such a union . . . and may even be forced to do so by the exertion of the union's economic power." 236 F.Supp. at 398. Since the district court's statement was merely dicta based on a distinguishable case, we feel no particular compunction in not adopting it. For the reasons stated in the text, we believe that the better view is that the Union cannot engage in indefinite recognitional picketing.

**12.** In *Vila Barr*, the Board held that a union's picketing of an employer to gain recognition for a single-employee bargaining unit was not an unfair labor practice under § 8(b)(7)(C), notwithstanding the fact that no petition for election was filed within 30 days. The failure to file a petition was excused by the Board because it would not have held an election under § 9(c) anyway based on its view that single-employee units are not certifiable under the Act. 157 N.L.R.B. at 589.

As a matter of the proper interpretation of § 8(b)(7)(C), *Vila Barr* seems indistinguishable from this case. As shown in the text *infra*, we conclude that the Act forbids recognitional picketing after a reasonable time when no Board-conducted election will be held. It makes no difference in applying this provision that the employees here could be represented

by some other union whereas the single employee in *Vila Barr* could not. Section 8(b)(7) was designed to stop unions from imposing their will on employers and employees. That policy is no less salient in a single-employee situation than it is in a guard-employee situation. We, therefore, believe that, to the extent *Vila Barr's* result was contingent on a reading of § 8(b)(7)(C) different from that presented here, that decision was incorrect.

**13.** There is some dispute as to whether the recognitional picketing amounts to an unfair labor practice immediately or not until after the Board declines to hold an election. The distinction was outlined carefully in the *Squillacote* decision of this court, *supra* note 3. There the court declined to decide the issue, but concluded that the District of Columbia Circuit in *Wells Fargo* had decided that the Act was not violated until after the Board declines to hold an election. 561 F.2d at 34 n.4. While we need not decide the issue here either, we do note that since the Board can hold an election the result of which might affect whether § 8(b)(7)(C) has been violated, it would seem reasonable to await that decision before holding that the union has acted improperly. *See Wells Fargo, supra* at 1377.

105 Cong.Rec. 15513 (1959) (remarks of Representative Smith). This comment and others like it during the debates [14] demonstrate that Congress believed that indefinite recognitional picketing could give rise to serious abuses by a union that could significantly undermine the rights of both the employees and employers.[15]

The exception to section 8(b)(7)(C) that the Union asks this court to recognize would open the door to the same types of abuse Congress sought to proscribe by that provision.[16] While it may be true that these employees wish to be represented by this union because of the legitimate persuasive force of the Union's campaign, we cannot blind ourselves to the possibility that some other union seeking to organize guards in the future might attempt to force itself on an employer and its employees in much the same way that some unions did prior to 1959. It seems inconceivable that Congress would have intended that its special treatment of guards in section 9(b)(3) could be used as a basis for depriving them of the protections of their section 7 rights envisioned by the ban on indefinite recognitional picketing.[17] Thus, we conclude that section 8(b)(7)(C) is a bar to the picketing engaged in by the Union and therefore we uphold the Board's decision that this picketing constituted an unfair labor practice.

## V

In addition to the Union's argument that the Act should not be interpreted as a matter of statutory construction to forbid

---

14. Senator McClellan during the Senate debates on the picketing provision described the union threat to employees and employers that the amendment was intended to proscribe as follows:

> "We will organize your men and put them in the union, irrespective of their wishes. We will make union members of them, or else we will picket your plant and apply that economic pressure on you."

105 Cong.Rec. 6648 (1959) (remarks of Senator McClellan). *See also* 105 Cong.Rec. 6428–29 (1959) (remarks of Senator Goldwater); *id.* at 14348 (memorandum of Representative Griffin).

15. This view of the purpose of § 8(b)(7) has been recognized by the Supreme Court. In *Connell Constr. Co. v. Plumbers & Steamfitters Local Union 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Court stated:

> One of the major aims of the 1959 Act was to limit "topdown" organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees. Congress accomplished this goal by enacting § 8(b)(7), which restricts primary recognitional picketing . . . .

*Id.* at 632, 95 S.Ct. at 1840.

16. Perhaps the District of Columbia Circuit's comment in *Wells Fargo* that "[t]o tolerate continued picketing after dismissal of the Union's petition would bestow on petitioner greater rights than are afforded qualifying unions" was referring to this particular problem. 553 F.2d at 1377.

17. Another aspect of the legislative history which supports the conclusion that Congress intended there to be no picketing in a situation such as presented here is the fact that the full Congress had before it a bill and the Senate had before it an amendment from the floor which would have permitted this picketing and both were rejected. In the Griffin-Landrum Bill there was a provision that made it an unfair labor practice to engage in recognitional picketing both where "the union cannot establish the existence of a sufficient interest on the part of the employees in having it represent them" and where "picketing has been engaged in for a reasonable period of time and an election has not been conducted." S.Rep.No.175, 86th Cong., 1st Sess. (1959) (Minority Views), reprinted in [1959] U.S.Code Cong. & Admin. News pp. 2318, 2379. Obviously, the latter provision with minor revision is 8(b)(7)(C). The former provision which would have covered the Union's present situation was rejected. Congress apparently distrusted majorities not electorally confirmed. That inference is reinforced by the fact that Senator McClellan offered an amendment, rejected on the floor of the Senate, that would have covered the Union's present situation. His amendment would have made recognitional picketing an unfair labor practice unless the union filed with the employer "a petition signed by a majority of the employees of such employer" requesting the union be recognized. 105 Cong.Rec. 6647 (1959). That amendment was voted down. *Id.* at 6657. Again, this action suggests that Congress did not intend for the mere existence of a claimed majority to serve as the basis for indefinite recognitional picketing. The District of Columbia Circuit after a lengthier discussion of this legislative history reached a similar conclusion in *Dayton Typographical Union No. 57 v. NLRB,* 117 U.S.App.D.C. 91, 94–95, 326 F.2d 634, 637–38 (1963).

its picketing, it challenges the constitutionality of that interpretation, both as to section 9(b)(3) and 8(b)(7)(C). The Union argues that section 9 as interpreted violates its and the employees' First Amendment right to freedom of association.[18]

The Union reasons that 9(b)(3) deprives it and Purolator's employees of a benefit—Board certification—merely because the Union serves as a conduit for the association of non-guard employees and because the driver-guards wish to associate with non-guards. Thus, the Union characterizes the Act as imposing a penalty on it and the employees merely for exercising their right of association, which the Union alleges is comparable to the penalties imposed on the exercise of constitutional rights in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[19]

The problem with the Union's analysis is that it is not enough to show there has been some infringement of a constitutional right. As the Supreme Court held in *American Communications Ass'n v. Douds*, 339 U.S. 382, 400, 70 S.Ct. 674, 684, 94 L.Ed. 925 (1950):

> We must, therefore, undertake the "delicate and difficult task . . . to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

*See also Konigsberg v. State Bar of California*, 366 U.S. 36, 50–51, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).

Balancing the public interest to be served by section 9(b)(3) against the minimal infringement on the Union and employees' rights, we conclude that this provision is plainly constitutional. Congress in passing this provision did so in order to avoid conflicting loyalties in employees deemed to be of particular importance to the employer. As the House Report concluded:

> If we are to produce goods competitively and in such large quantities that many can buy them at low cost, then, just as there are people on labor's side to say what workers want and have a right to expect, *there must be in management and loyal to it persons not subject to influence or control of unions* . . . ..

H.R.Rep.No.245, 80th Cong., 1st Sess. 16 (1947) (emphasis added). One set of employees Congress concluded fell within that category was guards. *Id.* It is not this court's prerogative to second-guess that kind of public policy determination by Congress, *Douds, supra* 339 U.S. at 400–01, 70 S.Ct. 674, and therefore, this provision must be deemed to serve a substantial public policy.

As to the degree of infringement caused by this statute, it can only be characterized as incidental and minimal. Nothing restricts the guards' right to join the Union, to associate with non-guards or even to receive voluntary bargaining rights. All that is deprived is certification and a Board-conducted election. Balanced against the public policy served by this provision, we

---

**18.** The Union also mentions the equal protection clause implied in the Fifth Amendment and "substantive due process" as additional bases for holding § 9(b)(3) unconstitutional. It appears that the constitutional argument actually involves merely the freedom of association right arguably applied in two different ways: the Act directly restricts the ability of the employees to associate with the Union and the Act imposes a penalty on the Union for its past and present associations. It is not clear what additional constitutional theory was intended by the invocation of the Fifth Amendment. Regardless, we find no substantial Fifth Amendment problem raised by § 9(b)(3).

**19.** Those cases both present significantly more severe penalties imposed for far less legitimate reasons than is the case here. In *Shapiro* welfare recipients were denied welfare benefits merely for having crossed state lines in furtherance of their constitutional right to travel. The Court had serious doubts that any legitimate justification existed to support that penalty. 394 U.S. at 631–33, 89 S.Ct. 1322. Similarly, in *Sindermann* the Court hypothesized a situation where a teacher in a state-supported school is dismissed for asserting his or her constitutional rights. 408 U.S. at 597, 92 S.Ct. 2694. There is no meaningful comparison between this case and a situation where an individual is deprived of his or her livelihood merely for making unpopular statements.

find there is too insubstantial an infringement on the Union's and employees' rights to justify holding this provision to be violative of the constitution. *See also Squillacote, supra*, note 3, at 16.

## VI

The Union's final argument is that section 8(b)(7)(C) is unconstitutional as applied to it in this situation. It argues, citing *Thornhill v. Alabama*, 310 U.S. 88, 102–06, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *AFL v. Swing*, 312 U.S. 321, 325–26, 61 S.Ct. 568, 85 L.Ed. 855 (1941) that picketing is constitutionally protected.[20] Again, the Union is correct as far as it goes, but the issue remains whether this particular picketing is constitutionally protected against this particular restraint.

 We find that section 8(b)(7)(C) as applied here is designed merely to place a reasonable limit on picketing "which experience has shown [is] undesirable." *NLRB v. Fruit & Vegetable Packers & Warehousemen Local 760*, 377 U.S. 58, 62, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). *See also Int'l Brotherhood of Teamsters, Local 695 v. Vogt*, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957). As discussed in Part IV *supra*, Congress attempted to remedy a very specific evil which experience had established flowed from this type of picketing. *NLRB v. Fruit & Vegetable Packers & Warehousemen Local 760*, 377 U.S. 58, 63, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (quoting *NLRB v. Drivers, Chauffeurs, Helpers Local 639*, 362 U.S. 274, 284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960). Congress was concerned with the problem created by unions using the threat of indefinite picketing as a basis for forcing an employer to recognize the union as the employees' bargaining representative. The remedy Congress adopted was to place limits on picketing absent electoral evidence[21] of majority support in the Union. We cannot say that the narrow and non-discriminating limits on picketing imposed by Congress in order to avoid what it regarded as a significant labor problem are infirm constitutionally. *See Dayton Typographical Union No. 57 v. NLRB*, 117 U.S. App.D.C. 91, 326 F.2d 634 (1963); *NLRB v. Local 3, IBEW*, 339 F.2d 600, 601 (2d Cir. 1964) (per curiam).

Since we find none of the Union's arguments persuasive on the facts presented in this case, we uphold the Board's determination that the Union has committed an unfair labor practice by engaging in recognitional picketing after the Board held that no election would be conducted. Therefore, we enforce the Board's cease and desist order.

ENFORCED.

---

**20.** It is not even clear that the cases cited by the Union if given their broadest interpretation would lead to a different result in this case. However, we need not concern ourselves with that prospect because the Court itself has directed us to give a relatively restricted view to those decisions. *See Givoney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); *Hughes v. Superior Court,* 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); *International Brotherhood of Teamsters, Local 695 v. Vogt*, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957).

**21.** For a discussion of the importance to Congress of actual elections as the basis for determining majority support in the recognitional picketing context, *see* note 17 *supra*.