NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

A. LASAPONARA & SONS, INC., a wholly
owned subsidiary of ERE Industries, Inc.
and ERE Industries, Inc., Respondents.

No. 893, Docket 75–4215.

United States Court of Appeals,
Second Circuit.

Argued May 26, 1976.

Decided Sept. 13, 1976.

David S. Fishback (N.L.R.B., Washington, D. C., John S. Irving, Jr., General Counsel, John E. Higgins, Jr., Deputy General Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief, John H. Ferguson, Washington, D. C., of counsel), for petitioner.

Guy Farmer, Washington, D. C. (Farmer, Shibley, McGuinn & Flood, Washington, D. C., on the brief, William A. Gershuny, Washington, D. C. of counsel), for respondents.

Before HAYS, MULLIGAN and MESKILL, Circuit Judges.

HAYS, Circuit Judge:

Petitioner National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) seeks enforcement of its order filed on June 30, 1975, adopting the findings and conclusions of the Administrative Law Judge that respondents have engaged in several unfair labor practices in violation of Sections 8(a)(1), (3) and (5) of the Act, 29 U.S.C. § 151 *et seq.*[1]. We enforce the Board's order in all respects.

I. *Withdrawal of Recognition and Unilateral Changes in the Terms of Employment*

Respondent A. Lasaponara & Sons, Inc. (the "Company" or "Employer") is engaged in the manufacture and wholesale distribution of cheese and related products at its plant in Oriskany, New York. During the autumn of 1973 a majority of the production and maintenance employees at the Oriskany plant signed authorization cards designating the Mechanics Educational Society of America, AFL–CIO (the "Union") as their sole representative for the purposes of collective bargaining.[2] On December 3, 1973 Joseph Lasaponara, president of the Company, received a letter from James Kozma, an official of the Union, requesting Lasaponara to meet with Union representatives to negotiate a collective bargaining agreement. On December 5 the Union filed a petition for a representation election with the National Labor Relations Board and two days later informed the Company by letter that several of the Company's employees had been elected to the Union shop committee at the plant. Lasaponara contacted the president of the Oneida Development Corporation, Thomas Zappone, and requested him to meet with the Union to discuss the situation. Oneida Development Corporation had been instrumental in bringing the Company to Oriskany and it maintained certain authority with respect

---

1. The Board's decision is reported at 218 N.L.R.B. No. 168 (1975).

2. The respondents do not dispute the Board's conclusion that these employees constitute an

appropriate collective bargaining unit within the meaning of Section 9(b) of the Act, 29 U.S.C. § 159(b).

to any sale of ownership interests in the business. At his meeting with the Union representatives Kozma and James DeBella on December 10, Zappone explained his relationship to the Company and stated that the Company was currently engaged in merger discussions with another corporation which might be jeopardized by a representation election at that time. The Union officials replied that they had no wish to disrupt the negotiations and requested a meeting with Lasaponara so that a solution could be achieved.

On December 12, 1973 Kozma and DeBella met with Lasaponara and Zappone. The Board found that at the meeting Lasaponara stated that he had no objection to the Union but expressed concern that an election at that time could affect production and consequently upset merger negotiations. The Union officials informed Lasaponara that an election would be unnecessary because the Employer could voluntarily recognize the Union as its employees' exclusive bargaining agent on the basis of the authorization cards which the Union had secured from a majority of the Oriskany plant workers. In addition to voluntary recognition the Union officials proposed an immediate 25¢ per hour wage increase and a delay in formalizing a contract. There also was a discussion of certain other contract terms and Lasaponara stated that he would consider the Union's proposal.

On December 14, 1973 Lasaponara again met with Kozma and DeBella. According to credited testimony at the Board hearing Lasaponara stated that he was not willing to sign a contract with the Union at that time but that he would grant a 20¢ per hour wage increase if the Union would take it into account when negotiations for a full contract took place. The Union representa-tives agreed to the 20¢ figure provided that the Employer continued certain past practices concerning employment benefits and regular wage increases. The Board found that at the December 14 meeting Lasaponara agreed to sign a formal Recognition Agreement and begin full contract discussions with the Union on April 1, 1974 by which time it was assumed the merger negotiations would be completed. In return the Union representatives agreed to withdraw the election petition from the Board. On December 20, 1973 Kozma and DeBella presented the Employer's Production Manager, Fazzino, with the written Recognition Agreement for transmittal to Lasaponara.[3] On the same day the Union sent a withdrawal request to the NLRB which was granted on December 26.[4]

Although the Company, as it had agreed, instituted the 20¢ per hour wage increase on December 24, 1973, Lasaponara failed to sign the formal Recognition Agreement. DeBella contacted Fazzino shortly after the 1st of January to inquire why the document had not been signed and returned. Fazzino told DeBella that the intervening holidays had delayed transmittal of the document to Lasaponara but that the Union would soon receive it. On February 5 DeBella spoke to Fazzino about certain employee complaints concerning health insurance coverage and wage increases and, on this occasion, again raised the matter of the unexecuted Recognition Agreement. Fazzino replied that Lasaponara had been very busy. The next day DeBella contacted Zappone in an attempt to arrange a meeting with Lasaponara. This effort was unsuccessful.

In early March, 1974 DeBella again contacted Fazzino to discuss the proposed layoff of certain employees, including several members of the Union committee. DeBella

---

**3.** This document provided in full:

> "Recognition Agreement
> by and between
> Lasaponara & Sons, Inc.
> and
> Mechanics Educational Society
> of America AFL–CIO

Effective April 1, 197[4], Lasaponara & Sons, Inc. will recognize the Mechanics Educational Society of America, AFL–CIO as the sole collective bargaining agency on behalf of the employees employed at its plant located on Base Road, Oriskany, N. Y. for rates of pay, wages, hours of work and any other conditions of employment."

**4.** On January 14, 1974 the Union sought to withdraw a representation petition that it had filed with the New York State Labor Department. This request was granted on February 8, 1974.

contended that such a layoff would be improper and that the Union would file charges if it took place. Fazzino discussed the matter with Lasaponara and the layoff was not effectuated. In addition, DeBella spoke directly with Lasaponara on March 5 about certain other employee complaints. Lasaponara suggested that DeBella put these grievances into writing and the latter did so in a letter dated March 8.

In the meantime merger discussions were continuing between the Company and respondent ERE Industries, Inc. ("ERE") which was to purchase all the Company's stock. DeBella was made aware of this in March by Zappone who also gave DeBella the name and telephone number of Frank Oddi, the president of ERE. On March 27, 1974, Oddi addressed the Company's employees telling them in effect that he was to be the new president of A. Lasaponara & Sons, Inc., and that the employment benefits provided by the parent company, ERE, would be extended to them. On April 1, DeBella placed a telephone call to Oddi and, failing to reach him, left a message requesting that he call the Union. It was determined by the Board that Oddi was apprised of the call but never returned it. On April 23 ERE assumed ownership of the Company.[5] On May 1 the changes in the employment conditions of the Company promised by Oddi were put into effect.

5. Joseph Lasaponara remained with the Company as its sales manager.

6. 29 U.S.C. § 158 provides, in relevant part:
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   .   .   .   .   .

   "(5) to refuse to bargain collectively with the representatives of his employees   .   .   .

   .   .   .   .   .

   "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agree-

On the basis of the foregoing findings the Board held that the Company violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5), (1),[6] by withdrawing recognition from the Union and refusing to bargain collectively and by unilaterally changing the terms and conditions of employment of its employees. We agree. Once a collective bargaining agent is voluntarily recognized by an employer as the representative of its employees the bargaining relationship must be permitted to continue and recognition may not be withdrawn at will. See *N.L.R.B. v. Broad Street Hospital and Medical Center*, 452 F.2d 302 (3d Cir. 1971); *N.L.R.B. v. San Clemente Publishing Corp.*, 408 F.2d 367 (9th Cir. 1969). Unilateral changes in the terms of employment made by an employer in disregard of the duly-recognized collective bargaining agent is a well established violation of the employer's statutory duty to bargain collectively. *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *N.L.R.B. v. General Electric Co.*, 418 F.2d 736, 746 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). The only issue here is whether the Board correctly determined that the Employer voluntarily recognized the Union as the representative of its employees at the December 14 meeting between Lasaponara and the Union officials, Kozma and DeBella.[7] We

ment reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession   .   .   ."

7. Contrary to respondents' contention, the Administrative Law Judge and, consequently, the Board did *not* reject the General Counsel's theory that the Union was orally recognized at the December 14 meeting. The opinion of the Administrative Law Judge states, with respect to the General Counsel's argument:
   "Considering all of the foregoing, I find that the facts support the General Counsel's contentions and do not support the Respondent's contentions. Thus, the facts reveal that the Union was designated as the collective bargaining representative by a majority of the employees in the appropriate bargaining unit. The facts are clear that the employing entity, in December, 1973, had no question as to the union's majority status but in fact agreed that such status existed. Thus, the employer's action in agreeing to recog-

hold that this conclusion is fully supported by substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Respondents argue that Lasaponara agreed on December 14 to recognize the Union only in the event that the business was not sold, and that therefore the Union at that time agreed to defer its demand for recognition until the merger negotiations were finished. However, the sole evidence supporting this position is Lasaponara's own testimony which the Administrative Law Judge declined to credit. On the other hand, the Board's finding of oral recognition on December 14 is supported by testimony of the Union officials Kozma and DeBella and by subsequently occurring events including (1) the fact that although the Union officials had secured authorization cards from a majority of the employees they had agreed to the Employer's request to forego an election and withdrew their petition to the Board, (2) the institution of a 20¢ per hour wage increase by the Employer shortly after December 14, which had been requested by the Union officials at that meeting, and (3) supervisor Fazzino's grievance adjustments with Union representative DeBella acting on behalf of certain employees. The inferences that the Board drew from these incidents are reasonable and must therefore stand. *Universal Camera Corp. v. N.L.R.B., supra.* Since the Employer's voluntary oral recognition of the Union as the collective bargaining agent of its employees on December 14 is binding, *N.L.R.B. v. Broad Street Hospital, supra* at 305, the fact that Lasaponara never signed the formal Recognition Agreement is immaterial. Under these circum-

stances the Company's refusal to bargain with the Union after the transfer of ownership and its institution of unilateral changes in the terms of employment constituted a clear violation of Sections 8(a)(1) and (5) of the Act. *N.L.R.B. v. Katz, supra.* This conclusion is unaffected by the change in stock ownership of the Company. *See N.L.R.B. v. Burns Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

## II. *Threats of Reprisals*

■ The Board held that the Employer violated Section 8(a)(1) of the Act by interfering with its employees' organizational rights guaranteed under Section 7, 29 U.S.C. § 157,[8] finding that its officers had coercively interrogated and threatened certain employees concerning Union-related activities. This conclusion is fully supported by undisputed facts and evidence in the record. During December, 1973, Lasaponara, then president of the Company, held a series of meetings with his employees whom he interrogated in his office, two at a time, concerning the reasons why they wanted or thought they needed a union. Crediting the testimony of certain of these employees while rejecting Lasaponara's corresponding denials, the Administrative Law Judge determined that at some of these meetings Lasaponara made undisguised threats of reprisal to employees for assisting or being sympathetic to the unionization drive under way at Oriskany. Lasaponara told several employees that if they helped the Union "he would fix them." He told others that he could not give them their scheduled raises so long as they dealt with the Union. Similarly, a supervisor of the Company, John Kosh, stated to one employee in November, 1973, that "it would

---

nize the Union in the future, without other evidence as to majority status, clearly fixes the Union as the recognized exclusive collective bargaining agent of the employees involved. Contrary to Respondent's contentions, the facts do not reveal that the Union abandoned or agreed to give up bargaining rights."

**8.** 29 U.S.C. § 157 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor or-

ganizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

be futile for the employees to select the Union since the employer would not accept the Union as an agent for the employees."[9] In addition, it was found by the Administrative Law Judge that on two occasions early in 1974 production manager Fazzino[10] questioned several employees about the identity of those who had been active in promoting the Union or had signed authorization cards on its behalf and whether any Union meetings had taken place. Fazzino was also found to have crumpled and thrown on the floor a petition signed by several employees protesting the scheduling of work on Palm Sunday and calling the employee who had presented him with it, Eva Wilson, Chairman of the Union shop committee, a "troublemaker."

These actions taken by the president of the Company and its production manager and supervisor constitute archetypal Section 8(a)(1) violations since they "were calculated to frustrate the union's organization campaign by instilling fear of reprisals in the employees." *N. L. R. B. v. L. E. Farrell Co., Inc.*, 360 F.2d 205, 207 (2d Cir. 1966). The president of the Company called the employees into his office and there questioned and explicitly threatened them concerning the Union. A clearer example of coercive interrogation would be difficult to imagine. *See, N. L. R. B. v. Gladding Keystone Corp.*, 435 F.2d 129 (2d Cir. 1970); *N. L. R. B. v. Milco, Inc.*, 388 F.2d 133 (2d Cir. 1968). Fazzino's request for the names of those who had signed authorization cards plainly indicated to the interrogated employees that open support of the Union would undoubtedly place one in an unfavorable light with the Employer in contrast to those employees who refrained from exercising their statutory rights. That this would be the case was dramatically demonstrated when Fazzino called Eva Wilson a "troublemaker" and threw the proffered petition on the ground. Similarly, Kosh's remark about the purported futility of sup-

porting the Union could have had no other purpose but to discourage such an effort by the employees. These kinds of statements by employers' agents are prohibited by Section 8(a)(1). *See N. L. R. B. v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292, 296–97 (2d Cir. 1972); *N. L. R. B. v. Gerbes Super Markets, Inc.*, 436 F.2d 19 (8th Cir. 1971); *N. L. R. B. v. International Metal Specialties, Inc.*, 433 F.2d 870 (2d Cir. 1970), *cert. denied*, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971); *Snyder Tank Corp. v. N. L. R. B.*, 428 F.2d 1348 (2d Cir.), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 583, 27 L.Ed.2d 632 (1970); *Federation of Union Representatives v. N. L. R. B.*, 339 F.2d 126, 129–30 (2d Cir. 1964).

### III. *Discharge of Employees for Engaging in Protected Concerted Activities*

Palm Sunday is customarily a work day for the Company since it falls one week before Easter Sunday and the Easter season is one of the busiest of the year in the cheese industry. Given the increased demand for its product and the short shelf life of certain types of cheese the Company has found it necessary to lengthen the work week to seven days at this time of the year. On Friday, April 5, 1974 the Chairman of the Union shop committee presented plant manager Fazzino with a petition signed by twelve of the Company's twenty employees protesting the scheduling of Palm Sunday, April 7 as a work day. The petition stated:

> "Since this is a religious holiday that is important to us, we request that this schedule be rescinded.
>
> "In the event that this schedule is not changed, you are advised that we will not report for work on Palm Sunday, April 7, 1974, but will report to work on Monday, April 8, 1974."

On Saturday, April 6 Fazzino received a telephone call from Union representative DeBella concerning the petition. Fazzino told DeBella that "everyone knows we have

---

**9.** Respondents do not dispute the fact that Kosh was a supervisory employee within the meaning of Section 2(11) of the Act, 29 U.S.C. § 152(11). An employer may be held liable for coercive statements made by supervisory per-

sonnel. *See, e. g., Irving Air Chute Co. v. N. L. R. B.*, 350 F.2d 176, 179 (2d Cir. 1965).

**10.** Fazzino was also Lasaponara's partner in the business.

to work" on Sunday and refused to accede to the demand that the schedule be changed. DeBella reiterated the signatory employees' objection to working on a religious holiday and stated that they would be willing to work overtime the following week. Fazzino rejected this offer as unsatisfactory and the conversation was terminated. The next day, Palm Sunday, six of the petitioners failed to appear for work. They did report for work the next day however and nothing further was said. On June 7, 1974, two months later, the Employer fired these employees for their refusal to work on Palm Sunday. We agree with the Board that these discharges interfered with the employees' right, statutorily protected by Section 7 of the Act, to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection" thereby violating Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).

■■ Discharge of employees for engaging in concerted activities protected by Section 7 is an unfair labor practice. *N. L. R. B. v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); *Shelly & Anderson Furniture Manufacturing Co., Inc., v. N. L. R. B.,* 497 F.2d 1200 (9th Cir. 1974); *First National Bank of Omaha v. N. L. R. B.,* 413 F.2d 921 (8th Cir. 1969); *N. L. R. B. v. Morris Fishman and Sons, Inc.,* 278 F.2d 792 (3d Cir. 1960); *N. L. R. B. v. M & M Bakeries, Inc.,* 271 F.2d 602 (1st Cir. 1959). The one day strike or work stoppage by the discharged employees in support of their petition protesting the Palm Sunday schedule is statutorily protected because it constituted concerted activity aimed at changing working conditions at the plant. *See N. L. R. B. v. Leprino Cheese Co.,* 424 F.2d 184 (10th Cir.), *cert. denied,* 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970). While the strike undoubtedly brought inconvenience and economic loss to the Company in view of its unusually heavy production schedule due to the Easter season, such a result is obviously the very object of any concerted employee action protected by the Act. Although it is true that not all concerted employee activities are protected by Section 7, *see N. L. R. B. v. Washington*

*Aluminum Co., supra,* 370 U.S. at 17, 82 S.Ct. 1099, the economic pressure brought to bear here, unlike that present in the narrow class of cases relied on by respondents, clearly failed to reach a degree so grossly disproportionate to the goal sought to be achieved that it renders the conduct unprotected and thereby justifies discharge of the participating employees. In *N. L. R. B. v. Marshall Car Wheel & Foundry Co.,* 218 F.2d 409, 411 (5th Cir. 1955) cited by respondents, the planned employee walkout held to be unprotected occurred at the moment molten iron was ready to be poured and this action "might well have resulted in substantial property damage" to the plant. Similarly in *Dobbs Houses, Inc. v. N. L. R. B.,* 325 F.2d 531 (5th Cir. 1963) a mass departure of waitresses at the dinner hour to protest the discharge of a supervisor was held unprotected by Section 7. *See also, N. L. R. B. v. Local Union No. 1229, Int. Brotherhood of Electrical Wkrs.,* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *Southern Steamship Co. v. N. L. R. B.,* 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942). The employees' conduct in the instant case was not simply an attempt to deliberately inflict economic harm on the Company without compensatory gain to themselves. It served a legitimate work-related goal and was therefore protected by the Act.

Respondents' reliance on *Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) is also misplaced. In *Emporium* a minority group of employees, dissatisfied with their union's reliance upon the existing collective bargaining agreement's grievance procedure refused to participate in it and, acting contrary to the union's advice, picketed their employer's store in an attempt to circumvent the union and bargain separately with the company over the terms and conditions of employment with respect to racial minorities. The Court held such conduct to be unprotected by Section 7 because it undercut the statutory principle of exclusive representation embodied in Section 9(a) of the Act, 29 U.S.C. § 159(a). In the instant case, however, there is no evidence that the Palm

Sunday strikers were at odds with or attempting to by-pass their Union. Indeed, Union representative DeBella spoke to Fazzino before the strike and stated, in effect, that the Union supported the employees in this effort. Under these circumstances, *Emporium* is inapposite.[11]

IV. *Refusal to Rehire Employee Muraca Because of Union Activities*

Peter Muraca, who had been active in the Union's organization drive, was discharged for cause by the Company in December, 1973. According to Muraca's testimony which the Administrative Law Judge credited, on May 27, 1974 Muraca went to the plant and asked Fazzino if the Company would rehire him. Fazzino told him, "I know we need people, I have to wait until this union thing gets settled . . . you got me in trouble and some guy from the Board [NLRB] had a meeting with [Fazzino] and [Oddi]." Fazzino did not call Muraca as he had promised and Muraca returned on June 10. At that time Fazzino again stated that he would contact Muraca in the future about rehire but he never did. Given this uncontradicted testimony and the evidence of Muraca's earlier support of the Union the Board concluded that the Company's failure to rehire Muraca was based on his Union-related activities in violation of Section 8(a)(3) and (1).[12] *See, Phelps Dodge Corp. v. N. L. R. B.*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *Marlin-Rockwell Corp. v. N. L. R. B.*, 133 F.2d 258 (2d Cir. 1943). This determination is supported by substantial evidence in the record. Respondents attack Muraca's credibility but, of course, this is a question to be determined at the Board hearing not in the Court of Appeals.

Enforcement granted.

11. In view of our holding that the employees' conduct was protected by Section 7, we do not reach the question whether by taking no action against the strikers for two months the Company condoned their action. *See Confectionary and Tobacco Drivers and Warehousemen's Union, Local 805 v. N. L. R. B.*, 312 F.2d 108 (2d Cir. 1963).

12. Section 8(a)(3), 29 U.S.C. § 158(a)(3) provides in relevant part:

"(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."