755 F.2d 5
 118 L.R.R.M. (BNA) 2613, 53 USLW 2411,
102 Lab.Cas. P 11,365
 TRUCK DRIVERS LOCAL UNION NO. 807, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS
OF AMERICA, and Fred M. Caputo, an
Individual, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Wells Fargo Armored Service Corporation, Intervenor.
 No. 162, Docket 84-4083.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 11, 1984.
Decided Feb. 5, 1985.
 
 J. Warren Mangan, Long Island City, N.Y. (O'Connor & Mangan, Long Island City, N.Y., of counsel), for petitioners.
 Marjorie S. Gofreed, Atty., N.L.R.B., Washington, D.C. (Wilford W. Johansen, Acting General Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent.
 
 
 1
 Avrum M. Goldberg, Washington, D.C. (Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Richard N. Appel, Jonathan I. Saperstein, Washington, D.C., of counsel), for intervenor.
 
 
 2
 Robert M. Baptiste and Wilma B. Liebman, Washington, D.C., for amicus curiae Intern. Broth. of Teamsters.
 
 
 3
 Lester Asher and Stephen B. Rubin, Chicago, Ill. (Asher, Pavalon, Gittler & Greenfield, Ltd., Chicago, Ill.), for amicus curiae Service Employees Intern. Union, AFL-CIO, CLC.
 
 
 4
 Before MANSFIELD and KEARSE, Circuit Judges, and METZNER, Senior District Judge.*
 
 METZNER, Senior District Judge:
 
 5
 Petitioner Truck Drivers Local Union No. 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 807") seeks review of a decision and order of the National Labor Relations Board ("the Board") dismissing an unfair labor practice complaint against intervenor Wells Fargo Armored Services Corporation ("Wells Fargo"). 270 N.L.R.B. No. 106 (May 18, 1984).
 
 
 6
 At issue is the validity of the Board's determination that under Section 9(b)(3) of the Labor Management Relations Act ("Act"), 29 U.S.C. Sec. 159(b)(3), Wells Fargo was privileged, following the expiration of its collective bargaining agreement with Local 807, to withdraw voluntary recognition of Local 807 because of that union's status as a mixed guard union.
 
 
 7
 We find that the Board's interpretation of Section 9(b)(3) was reasonable. The petition for review of the Board's decision is dismissed.
 
 BACKGROUND
 
 8
 Wells Fargo, an armored car service incorporated in Delaware, transports and delivers money, securities and other valuables for banks and commercial customers. The company operates two facilities in the New York area which employ approximately 93 persons as guards on a full or part-time basis. From 1948 until June 18, 1979, the two New York facilities maintained a collective bargaining relationship with Local 820 of the Teamsters. Local 820's membership and leadership consisted exclusively of guards employed in the armored car industry. Local 820 was nonetheless a nonqualified union under Section 9(b)(3) because although it did not admit any nonguards to membership, it was affiliated directly with the Teamsters, who do admit to membership employees other than guards. Such a union will hereinafter be referred to as a mixed guard union. The last collective bargaining agreement between Local 820 and Wells Fargo was effective through March 16, 1980.
 
 
 9
 On June 18, 1979, Local 807, a much larger Teamsters local that admitted both guards and nonguards to its membership, notified Wells Fargo that by directive of the Teamsters' general executive board Local 820 had been merged into Local 807. Wells Fargo recognized the union pursuant to a successorship clause in the bargaining agreement with Local 820. Over the course of the remaining months of that agreement, Wells Fargo and Local 807 both proceeded in a manner consistent with full recognition.
 
 
 10
 As the expiration of the bargaining agreement drew near, Local 807 and Wells Fargo held numerous bargaining sessions in an effort to reach a new agreement. The existing agreement was twice extended to facilitate further negotiations. Wells Fargo, however, was unable to obtain certain economic and security-related concessions which it considered to be essential, and therefore made a final offer which was forthwith rejected by Local 807's membership. A strike commenced on April 14, 1980. Several further negotiating sessions proved unsuccessful in breaking the impasse. There is no evidence that Wells Fargo bargained in bad faith.
 
 
 11
 On June 2, 1980, while the strike was still in progress, Wells Fargo sent a letter to Local 807 which stated that as of that date Wells Fargo was "withdrawing the voluntary recognition accorded Local 807 IBT as collective bargaining representative of the armored car guard employees" at the two New York area facilities. Wells Fargo gave no notice prior to this letter of its intention to withdraw recognition.
 
 
 12
 Local 807 and one of its members, Fred Caputo, each subsequently filed unfair labor practice complaints against Wells Fargo charging violation of Section 8(a)(5) of the Act because of the refusal of Wells Fargo to bargain collectively with a representative of its employees. After the Board issued a consolidated complaint on the charges of Local 807 and Caputo, an administrative law judge ("ALJ") held hearings on the matter and issued an opinion in which he concluded that Wells Fargo's withdrawal of recognition was in derogation of its obligation under Section 8(a)(5) of the Act to bargain with the union. He reasoned that the voluntary recognition of Local 807 by Wells Fargo estopped it from withdrawing that recognition under the existing circumstances. The ALJ also found that Wells Fargo's decision to withdraw recognition was based solely on economic considerations and that any concerns about potential conflicts of interest testified to at the hearing were mere afterthoughts. Finally, the ALJ found that although Section 9(b)(3) of the Act precluded certification of Local 807, it did not bar the Board from issuing an order compelling the maintenance of a bargaining relationship voluntarily established.
 
 
 13
 The Board, by a vote of 3-1, reversed the ALJ and dismissed the consolidated complaint. It held that the congressional purpose in enacting Section 9(b)(3) was so overarching as to privilege Wells Fargo in the circumstances of this case to withdraw recognition from the union regardless of whether its present motivation was merely economic.
 
 DISCUSSION
 
 14
 This is a case of first impression involving the effect of a prior voluntary recognition on an employer's privilege under Section 9(b)(3) of the Act to refuse to recognize and bargain with a mixed guard union. We decide it within a well-established framework of case law and Board decisions on related issues.
 
 
 15
 At the outset we note the limited review of Board decisions provided for by Section 10(f) of the Act. Under this provision courts have generally accorded great respect to the expertise of the Board when its conclusions are rationally based. NLRB v. Yeshiva University, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). Indeed, the Supreme Court has made it clear that if the Board's construction of a statute is reasonably defensible, it should not be rejected merely because a court might prefer another construction. Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). The Board's interpretation should be disturbed only if it is " 'fundamentally inconsistent with the structure of the Act' and an attempt to usurp 'major policy decisions properly made by Congress.' " Id. (quoting American Shipbuilding Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).
 
 
 16
 Section 9(b)(3) of the Act was passed by Congress in 1947 as part of the Taft-Hartley Act. The section provides, in relevant part, that
 
 
 17
 "[T]he Board shall not(3) decide that any unit is appropriate for such purposes [collective bargaining] if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards."
 
 
 18
 The section performs two functions. The first clause limits the organizational rights of guards--they must be in units segregated from nonguard employees. The second clause, the one at issue here, denies mixed guard unions the right to be certified as a representative of a unit of guards. See, e.g., International Harvester, 145 N.L.R.B. 1747 (1964); Schenley Distilleries, 77 N.L.R.B. 468 (1948). Local 807 argues that there is a distinction between the two clauses: on the one hand, a mixed guard "unit" is inappropriate for any purpose; on the other hand, a mixed guard "union" cannot be certified to represent a proper unit but is not in and of itself inappropriate for all purposes. We shall discuss this distinction later, but for now turn to the parameters of the provision governing mixed guard unions.
 
 
 19
 It is clear that in light of Section 9(b)(3) the Board cannot compel an employer to recognize in the first instance a mixed guard union as the bargaining agent for its unit of guards. NLRB v. White Superior Div., White Motor Corp., 404 F.2d 1100, 1103 (6th Cir.1968). See also Teamsters Local 344 v. NLRB, 568 F.2d 12 (7th Cir.1978); City National Bank and Trust Co., 76 N.L.R.B. 213 (1948). It is equally clear, however, that under Section 9(b)(3) an employer may voluntarily recognize a mixed guard union as the bargaining agent for a unit of guards. White Motor Corp., 404 F.2d at 1103 (employer may, if it wishes, recognize such a union, but absent such consent employer may not be compelled, directly or indirectly, to recognize the union).
 
 
 20
 We turn to the legislative history of Section 9(b)(3) for guidance in determining whether the policy behind the section requires or precludes the issuance of the "bargaining order" sought by Local 807.
 
 
 21
 This legislative history, 93 Cong.Rec. 6444, reprinted in II NLRB, Legislative History of the Labor Management Relations Act, 1947, at 1541, 1581 (1948) ("Legislative History") (statement of Sen. Taft), shows that the section was a direct reaction to the Supreme Court's decisions in NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947), and NLRB v. E.C. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947), which enforced Board orders requiring an employer to bargain regarding a unit of its plant guards with the same union that represented the employer's production and maintenance employees. Each house of Congress drafted language as a response to the Supreme Court holding: the House bill excluded guards entirely from the protections of the Act; the Senate bill included them. The conference adopted the present language as a compromise so that guards could retain rights as employees under the Act. The conference chose the language, it said, because it found persuasive the exposition by the lower court in Jones & Laughlin, 154 F.2d 932 (6th Cir.1946) that guards who belong to a union representing plant employees would experience conflicting loyalties in the event of a strike because their obligation to the employer and the community would be incompatible with their obligation to the striking union.
 
 
 22
 The legislative history indicates as well that the conference was impressed by the dissenting views of Board Member Reynolds in such cases as Monsanto Chemical Co., 71 N.L.R.B. 11 (1946), wherein he argued that the Board has a duty to decline the use of its processes in order to avoid encouraging the creation of relationships which are incompatible with the Act and are inherently unsound labor practices. Legislative History, supra at 1541. Senator Taft further stated that "as to plant guards we provided that they could have the protection of the Wagner Act only if they had a union separate and apart from the union of the general employees." Id. at 1544.
 
 
 23
 Senator Murray, speaking in opposition to the proposed legislation, stated that "the conferees have adopted a new rule with respect to ... guards ... denying them rights under present legislation." Legislative History, supra at 1572. In analyzing the impact of the legislation, Senator Murray further stated that "[t]he restriction on Board discretion with respect to ... guards would require the Board wholly to ignore existing and satisfactory bargaining patterns...." Id. at 1581.
 
 
 24
 The Board and reviewing courts have consistently found that although in enacting Section 9(b)(3) Congress may have focused primarily on the particular situation in Jones & Laughlin, the broad language which it chose to use encompasses not merely divided loyalties at a company plant, but the potential for divided loyalty that arises whenever a guard is called upon to enforce the rules of his employer against any fellow union member. Teamsters Local 71 v. NLRB, 553 F.2d 1368, 1373 (D.C.Cir.1977).
 
 
 25
 It has been held uniformly in the last thirty years, for example, that armored car security personnel, like those employed by Wells Fargo, are guards within the meaning of Section 9(b)(3). In Teamsters Local 851 v. NLRB, 732 F.2d 43 (2d Cir.1984), the court found courier drivers to be guards and noted that the Board's consistent interpretation of the statutory term to encompass more than plant guards comports with the statutory and the legislative history. The potential for divided loyalty is present whether or not the same employer is involved. NLRB v. American Dist. Tel. Co., 205 F.2d 86 (3d Cir.1953); Armored Motor Services Co., Inc., 106 N.L.R.B. 1139 (1953) (potential for conflict of loyalty, though not so far-reaching as in plant situation, nevertheless present among armored car guards). Since 1953 the Board has consistently refused to overrule Armored Motor Services Co. See Teamsters Local 344 (Purolator Security, Inc.), 228 N.L.R.B. 1379 (1977), enforced, 568 F.2d 12 (7th Cir.1978); Teamsters Local 639 (Dunbar Armored Express, Inc.) 211 N.L.R.B. 687 (1974).
 
 
 26
 Local 807 and amici argue that even though armored car security personnel are guards for purposes of Section 9(b)(3), that section is merely a narrow exception to the general thrust of the Act and therefore should not be expanded to allow for the unilateral termination of consensual bargaining relationships. In their view, the potential conflict of loyalty with which Congress was concerned is, at least in the armored car industry, speculative at best. In any event, forced continuation of a relationship voluntarily initiated, they argue, is fundamentally different from forced recognition at the outset of a relationship. In their view an employer cannot have two bites at the apple; once it recognizes a mixed guard union, it must continue to bargain unless it has a good faith doubt of the union's continued majority status. This is the standard applicable to a collective bargaining relationship with a certified union. To hold otherwise, they argue, would be inconsistent with the Act's primary concern for stability in bargaining relationships.
 
 
 27
 The fact that Congress expressly precluded the Board from certifying a mixed guard union as the representative of a unit of guards, however, is certainly evidence that Congress disfavored such relationships.[1] Moreover, it is reasonable to infer from the statutory language and the decisions under it that the preclusion of certification portends more than merely a simple check on the Board's power to certify the results of an election. See, e.g., Teamsters Local 71 v. NLRB, 553 F.2d 1368, 1376 (D.C.Cir.1977), in which the court stated that the "agency reasonably could conclude that an organization falling within the limitations stated in Section 9(b)(3) should not be allowed to invoke the Board's processes." The courts have recognized that although members of a mixed guard union have certain rights under the Act, "the policy of Sec. 9(b)(3) dictates that such membership not bestow all the benefits normally associated with belonging to a labor organization." White Motor Corp., 404 F.2d at 1104. See also NLRB v. Bel-Air Mart, Inc., 497 F.2d 322, 328 (4th Cir.1974). The proscription against certification of mixed guard unions therefore means that there is little sense in an employee remaining a member of such a union. A guard can adequately protect his rights, however, by joining a union separate from that of other employees.
 
 
 28
 We are convinced that, based on the language and legislative history of Section 9(b)(3), the Board was warranted in interpreting the section as proscribing Board direction to an employer to bargain with a mixed guard union despite prior voluntary recognition of that union by the employer. There is sufficient support for the Board's conclusion that in enacting the statute, Congress knowingly decreased the stability of bargaining relationships in order to further its objective of protecting employers from the potential for divided loyalty. In view of this, we find no reasoned basis for a distinction between initial certification and compulsory maintenance of a voluntary relationship. A voluntary grant of recognition cannot change the substance of Section 9(b)(3).
 
 
 29
 The difference in the language Congress chose in discussing mixed guard units and mixed guards unions does not change our analysis. An employer who voluntarily recognizes a mixed guard union may not discontinue the relationship during the contract period. Burns Int'l. Detective Agency, Inc., 134 N.L.R.B. 451 (1961). The fact that employers have the option to recognize a mixed guard union voluntarily, however, does not require that the option be forever binding once accepted. Mixed guard unions are appropriate only so long as an employer consents to recognize them. White Motor Corp., 404 F.2d at 1103. Cf. Amoco Oil Co., 221 N.L.R.B. 1104 (1975) (noting that employer expressly consented to bargaining relationship).
 
 
 30
 Congress precluded certification of such unions because it realized that employers should not be forced to bargain with mixed guard unions. Employers may choose at the outset not to rely on the strictures that Congress enacted for their benefit, but the policy concerns inherent in the statute require that employers have the right to rely on it at some later point. Indeed, the record reflects that, regardless of Wells Fargo's present motivation for withdrawing recognition, the potential for divided loyalty is clearly present and likely heightened.
 
 
 31
 Local 807's argument that estoppel should apply to preclude Wells Fargo from withdrawing recognition is inapposite. The policy considerations behind the statute override an estoppel theory, for to recognize an estoppel would result in a situation inconsistent with the purpose of the statute. Cf. Teamsters Local 372 v. NLRB, 735 F.2d 969, 971 (6th Cir.1984). Reliance on such cases as NLRB v. A. Lasaponara & Sons, Inc., 541 F.2d 992 (2d Cir.1976), cert. denied, 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977), is misplaced. That case applies only to the situation in which a certifiable union is voluntarily recognized, rather than going to the expense of an election. We are dealing here with an uncertifiable union.
 
 
 32
 Finally, Local 807's claim that Section 9(b)(3) as interpreted violates its First Amendment right to freedom of association, as well as that of its member guards, is without merit. Balancing the public interest to be served, as found by Congress, against the minimal infringement, the provision is constitutional. See Teamsters Local 344 v. NLRB, 568 F.2d 12, 20 (7th Cir.1977). Section 9(b)(3) does not abrogate rights--it simply makes them less attractive. Guards can join any union they wish. Any diminution of their rights is not imposed by the Board, but rather is freely self-imposed by guards when they select a mixed guard union as their representative.
 
 
 33
 Local 807 argues that even if the potential conflict of loyalty does exist, it could be eliminated by less drastic means, such as leaving the employer to negotiate for a broad no-strike clause. The Board, however, has refused to adopt this approach in a case of initial recognition, Teamsters Local 639 (Dunbar Armored Express, Inc.), 211 N.L.R.B. 687, 689 (1974), and now refuses to adopt it even where there has been prior bargaining. We decline to overturn its rulings.
 
 
 34
 The petition is dismissed.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 35
 I respectfully dissent for the reason that in my view the Labor Management Relations Act (the "Act") does not authorize an employer unilaterally to withdraw recognition of a union with which the employer has had collective bargaining agreements for over 30 years merely because that labor organization is a "mixed-guard" union that could not in the first place have been certified as a representative of the employees.
 
 
 36
 This case of first impression is important since our decision can have a profound effect on the stability of collective bargaining relationships in businesses employing guards of many sorts throughout the nation (including plant guards, contract guards, armored car drivers and guards, couriers and deliverymen), who are represented by mixed-guard unions of their own choosing.[1] In my view the Board's action (with one member dissenting) in overruling the ALJ's recommended decision is unfortunate. Its effect is to upset well-established labor relationships by conferring upon employers of such personnel an unfair advantage going beyond the purpose and plain language of the Act.
 
 
 37
 Section 9(b)(3) of the Act was adopted by Congress in response to the reasoning of the Sixth Circuit in NLRB v. Jones & Laughlin Steel Corporation, 154 F.2d 932 (6th Cir.1946). Though it was later reversed by the Supreme Court, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947), the Court held that if demilitarized plant guards (who were also commissioned policemen) were represented by the same union as plant employees, they might find themselves in conflict with the latter when required as part of their duties to protect the employer's property and personnel. 154 F.2d at 934-35. The House proposed to resolve the conflict problem by excluding guards from the definition of "employee" in Sec. 2(3) of the Act. However, Congress chose not to go that far. Instead, it adopted Sec. 9(b)(3) as a compromise between the House bill and a Senate version that extended the Act's coverage to guards. The Conference Committee's Report expressly stated that
 
 
 38
 "[T]he Senate rejected a provision in the House bill which would have excluded plant guards as employees protected by the Act.... Under the language of clause (3), guards still retain their rights as employees under the National Labor Relations Act, but the Board is instructed not to place them in the same bargaining unit with other employees, or to certify as bargaining representatives for the guards a union which admits other employees to membership or is affiliated directly or indirectly with labor organizations admitting employees other than guards to membership." 93 Cong.Rec. 6444, reprinted in II NLRB, Legislative History of the Labor Management Relations Act of 1947, at 1541. (Emphasis supplied).
 
 
 39
 For present purposes the pertinent language of Sec. 9(b)(3) is its provision that "no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards." (Emphasis supplied).
 
 
 40
 Nothing in the language of Sec. 9(b)(3) prohibits the organization of a mixed-guard union or bars it from functioning as the representative of any group of employees. As the Supreme Court stated in United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 71-72, 76 S.Ct. 559, 564-65, 100 L.Ed. 941 (1956):
 
 
 41
 "Section 8(a)(5) declares it to be an unfair labor practice for an employer 'to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).' (Emphasis supplied). Section 9(a), which deals expressly with employee representation, says nothing as to how the employees' representative shall be chosen. See Lebanon Steel Foundry v. Labor Board, 76 U.S.App.D.C. 100, 103, 130 F.2d 404, 407 [ (1942) ]. It does not make it a condition that the representative shall have complied with Sec. 9(f), (g) or (h), or shall be certified by the Board, or even be eligible for such certification.[8] " [Second emphasis supplied and footnotes omitted].
 
 
 42
 In NLRB v. White Superior Division, White Motor Corp., 404 F.2d 1100 (6th Cir.1968), the court confronted the question of whether an employer violated Sec. 8(a)(1) and (5) by discouraging membership of guard employees in a mixed-guard union. It concluded that, even though the NLRB could not certify the union in question (the IAM) because of its mixed-guard status, membership in such a union was not unlawful and the employees could rightfully choose it to represent them:
 
 
 43
 "It is true the I.A.M. [the mixed-guard union] could never be certified as bargaining agent for the guards but this does not change the fact that the guards have a right under Sec. 7 of the Act to be members of the I.A.M. To hold otherwise would attribute too much to certification. It would, in effect, be saying that no labor organization has rights under the Act save a certified one. Certification gives an organization which achieves it additional rights not all its rights." 404 F.2d at 1103 n. 5.
 
 
 44
 Indeed, the Board has for many years recognized that the prohibition against certification does not constitute a bar to recognition. See, e.g., Wm. J. Burns Int'l Detective Agency, Inc., 134 N.L.R.B. 451, 463 (1961):
 
 
 45
 "Congress could readily have declared a guard unit inappropriate if the representative of that unit admitted non-guards to membership or was a direct or indirect affiliate of a labor organization which did so. Congress did not so declare, and the preceding statutory language covering the 'mixed guard unit' compels the conclusion that this omission in the latter situation was deliberate."
 
 
 46
 Although a union gains some advantages from certification (e.g., protection from raiding unions, Sec. 8(b)(4)(C), right to engage in concerted action in support of a jurisdictional dispute, Sec. 8(b)(4)(D)), a non-certified union representing a majority of the employees in a unit is entitled to the protections of the Act. See NLRB v. Gissel Packing Co., 395 U.S. 575, 598-99, 89 S.Ct. 1918, 1932, 23 L.Ed.2d 547 (1969); Rock-Hill-Uris, Inc. v. McLeod, 236 F.Supp. 395 (S.D.N.Y.1964), aff'd per curiam, 344 F.2d 697 (2d Cir.1965) (placement of non-certified union's name on ballot); NLRB v. White Superior Division, White Motor Corp., supra (protection against employer's discouraging employees from choosing a mixed-guard union); Bally's Park Place, 257 N.L.R.B. 777 (1981) (mixed guard union's name may appear on ballot as intervenor in representation election); Amoco Oil Co., 221 N.L.R.B. 1104 (1975) (employer required to recognize plant guard representative from uncertifiable union elected by production and maintenance unit); Wm. J. Burns Int'l Detective Agency, Inc., 134 N.L.R.B. 451 (1961) (normal contract-bar rules apply to a collective-bargaining agreement between an employer and mixed-guard union). As the Sixth Circuit pointed out in NLRB v. White Superior Division, White Motor Corp., supra:
 
 
 47
 "Since membership by guard employees in a union which also represents non-guards is not unlawful, it would be an unfair labor practice for an employer to take discriminatory action against guard employees on account of such membership." 404 F.2d at 1103.
 
 
 48
 One of the normal requirements of the Act is that once a valid bargaining relationship has been established the employer may not, if the union continues to represent a majority, repudiate it at the end of a contract since the effect would be to destroy the stability of relationships which the Act is designed to promote. NLRB v. A. Lasaponara & Sons, Inc., 541 F.2d 992, 995 (2d Cir.1976); Int'l Telephone & Telegraph Corp., 159 N.L.R.B. 1757 (1966), enforced in rel. pt., 382 F.2d 366 (3d Cir.1967), cert. denied, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968); Retail Clerks Local 324 (Vincent Drugs), 144 N.L.R.B. 1247 (1963).
 
 
 49
 "On the basis of the foregoing findings the Board held that the Company violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. Sec. 158(a)(5), (1), by withdrawing recognition from the Union and refusing to bargain collectively and by unilaterally changing the terms and conditions of employment of its employees. We agree. Once a collective bargaining agent is voluntarily recognized by an employer as the representative of its employees the bargaining relationship must be permitted to continue and recognition may not be withdrawn at will." 541 F.2d at 995. [Citation omitted]
 
 
 50
 To hold otherwise would be to put the employees at an unfair advantage, particularly during the period of an economic strike after the current contract has terminated, which is the situation in the present case. The threat of instant withdrawal of recognition thereafter, like a Sword of Damocles, would pose such a severe penalty that the employees would, despite having established a valid, healthy and long-continued bargaining relationship, be unable to continue it on a fair basis by invoking the protections of the Act to which they are entitled.
 
 
 51
 Thus a distinction must be drawn between creating, establishing, or certifying a union as the agent for establishing a collective bargaining relationship, on the one hand, and maintaining such a relationship after it has been created by the parties, on the other. Once an employer recognizes a non-certified union, that union is entitled to seek and obtain from the Board the same remedies as those available to a certified union. As the Board stated in Int'l Telephone & Telegraph, supra, 159 N.L.R.B. at 1764:
 
 
 52
 "On the contrary, we find that the unit which both parties recognized as appropriate when they entered into their 1964 negotiations was a product of the agreement of the parties. Bearing in mind that such a unit is not inherently inappropriate, and considering particularly the long bargaining history in that unit, as well as the timing and context of the Respondent's withdrawal, we hold that the Respondent is estopped at this time from disputing the appropriateness of the unit which it itself had accepted as a proper basis for bargaining during the very negotiations which it later disrupted by its withdrawal of recognition. Accordingly, we find that the Respondent, by withdrawing recognition from and refusing to bargain with the Union as bargaining representative of the professional employees in the engineer-technician unit has violated Section 8(a)(5) and (1) of the Act since October 8, 1964."In enacting Sec. 9(b)(3) as a compromise Congress was well aware of these distinctions. It recognized that it could have declared a mixed-guard union or affiliation to be inherently inappropriate. Instead, it chose to discourage such organizations only to the extent of denying them certification. It refused to make certification a condition precedent to representation by a mixed-guard union or recognition of such a union by an employer. If, as here, an employer chose to enter into a collective bargaining relationship with such a union, "[u]nder the language of clause (3), guards still retain their rights as employees under the National Labor Relations Act," II NLRB, Legislative History of the Labor Management Relations Act of 1947, at 1541.[2] In view of the scalpel-like precision with which Congress, after much debate, chose its compromising language, we should adhere to its plain unambiguous terms. See, e.g., Garcia v. United States, --- U.S. ----, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (when court finds the terms of a statute unambiguous, its inquiry is complete, except in "rare and exceptional circumstances") (quoting Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930)).
 
 
 53
 Despite the plain language of Sec. 9(b)(3) and the foregoing legislative history, the majority seeks to rewrite the Act on the basis of what it conceives to be "policy concerns inherent in the statute" and "policy considerations behind the statute" (Maj. Op. 10), relying on its own ipse dixit that "it is reasonable to infer from the statutory language and the decisions under it that the preclusion of certification portends more than merely a simple check on the Board's power to certify the results of an election." (Maj.Op. 9-10). Nothing in the statutory language or decisions under the statute supports that broad statement.[3] Moreover, the statement is directly contrary to the Act's strong policy in favor of maintaining ongoing relationships between an employer and a union representing a majority of its employees.
 
 
 54
 In the present case there is no question about the appropriateness of the bargaining unit involved or about Local 807's representation of a majority of the employees in that unit. Over the last 30 years of representation by a mixed-guard union recognized by Wells Fargo (first, Local 820, a guard unit affiliated with the Teamsters, a non-guard organization, and, later, Local 807, into which Local 820 merged) the employees have not experienced any actual or potential conflict of loyalties.[4] There was no question raised by Wells Fargo or anyone else about Local 807's right or authority to represent the Wells Fargo guards when Local 820 merged into Local 807 on June 18, 1979, or when the existing contract was terminated on March 16, 1980. Indeed that contract provided that it was "entered into by the Union and the Employer on behalf of themselves, their successors and assigns." It was not until June 2, 1980, that Wells Fargo withdrew recognition. In the intervening months 14 bargaining sessions were held in an effort to reach a continuing labor agreement, with Wells Fargo and Local 807 stipulating that all terms and conditions would be retroactive to March 17, 1980, the day after the termination date of the previous agreement. Wells Fargo withdrew recognition not because of any conflict or potential conflict on the part of its guard employees by reason of their representation by Local 807 but solely for economic reasons.
 
 
 55
 Thus there is no support in the record for the majority's statement that in the present case "the record reflects that, regardless of Wells Fargo's present motivation for withdrawing recognition, the potential for divided loyalty is clearly present and likely heightened." (Maj.Op. 10). The testimony of Timothy Hughes, Wells Fargo's Vice President in charge of labor relations, that the company withdrew recognition for various "security" reasons was rejected by ALJ Itkin, who found it incredible, stating:
 
 
 56
 "In particular, as discussed further below, I do not credit Hughes' assertions pertaining to the Employer's 'reasons' for withdrawing recognition from Local 807. I find here that these belated, eschewed, shifting and contradicted 'reasons' for the Employer's summary withdrawal of recognition on June 2, 1980, are afterthoughts now offered in an attempt to justify the Employer's action. I find that the Employer's June 2 decision was, in fact, predicated solely upon economic considerations, namely, Local 807's refusal to accept the Employer's 'final order.' See G.C. Exh. 14, quoted supra. In short, the Employer's belatedly claimed 'security' and 'conflict' related 'reasons' for refusing, after about one year, to bargain or deal any further with Local 807 are, on this record, plainly pretextual, and are not the real or true reasons for the action taken."
 
 
 57
 These findings were accepted by the Board, which stated "We have carefully examined the record and find no basis for reversing the finding."[5]
 
 
 58
 In short, the majority holds that an employer may recognize and contract with a non-certified union representing a majority of its employees as long as it conceives the arrangement to be to its advantage, but then unilaterally sever the relationship at will whenever it sees no advantage to it in a continuation, leaving the employees suddenly without a representative after many years of representation by the union. This decision is not only fundamentally unfair to the employees but contrary to the Act's basic policy of encouraging stability in labor relations. It is particularly unfortunate when one considers the hesitancy with which the term "guards" (originally referred to as "plant" guards because of the potential conflict faced by them in enforcing their employer's rules against co-employees who are members of the same union) was extended to "armored car employees" who are not employed to protect the employer's property under such circumstances but to protect the property of customers. Armored Motor Service Co., 106 N.L.R.B. 1139 (1953) (NLRB held, after much shifting of position, that armored car guards, who primarily protect property of the customers, are "guards" within the meaning of Sec. 9(b)(3). See also Local 851 v. NLRB, 732 F.2d 43 (2d Cir.1984) (per curiam) (armored car guards are "guards" for Sec. 9(b)(3) purposes).
 
 
 59
 For these reasons I would be guided by the Court's statement in NLRB v. Yeshiva University, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980), that although "we accord great respect to the expertise of the Board when its conclusions are rationally based on articulated facts and consistent with the Act ... [i]n this case ... the Board's decision satisfied neither criterion." As in American Shipbuilding Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965), "the role [here] assumed by the Board ... is fundamentally inconsistent with the structure of the Act and the function of the sections relied upon."
 
 
 60
 I would reverse the Board's order for the reason that Wells Fargo's withdrawal of recognition of Local 807 violated Sec. 8(a)(1) and (5) of the Act and remand the case to the Board for adoption of the ALJ's recommended order.
 
 
 
 *
 Hon. Charles M. Metzner, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Section 8(a)(5) is silent as to whether a union must be certifiable in order to invoke its protections. A suggested amendment, providing that only currently recognized or certified unions could bring unfair labor practice complaints against an employer charging a refusal to bargain, Legislative History, supra at 321, was not adopted by the conference. Id. at 1538. The refusal to require certification as a standing prerequisite for bringing complaints under Section 8(a)(5) does not support Local 807's arguments as to Section 9(b)(3). Congress' refusal may mean that uncertified unions which may be eligible for certification have rights under Section 8(a)(5), but it does not necessarily follow that uncertifiable unions have the same rights
 
 
 [1]
 Local 807, a mixed-guard union, alone represents both guard and non-guard employees of approximately 400 employers
 "8 A Board election is not the only method by which an employer may satisfy itself as to the union's majority status." (Citations omitted).
 
 
 [2]
 The majority relies on the statement of Senator Taft that "plant guards ... could have the protection of the Wagner Act only if they had a union separate and apart from the union of the general employees," as indicating that such a union could not invoke the processes of the Act. However, it is clear that Senator Taft was referring to a union's right to obtain certification as a collective bargaining representative, not to its other rights under the Act, which were clearly recognized in the quoted text of the Conference Committee's Report and in the numerous decisions so interpreting Sec. 9(b)(3)
 The majority also refers (Maj.Op. 9) to a statement by Sen. Murray as indicating an intent to change existing bargaining patterns. The context makes clear, however, that Sen. Murray was not asserting that, except for certification, the changes wrought by Sec. 9(b)(3) deprived guards of other rights under the Act. Moreover, the Conference Committee's report, which flatly states that guards retain their rights as employees under the National Labor Relations Act, prevails over the passing statement of one legislator. See, e.g., United States Dep't of State v. Washington Post Co., 456 U.S. 595, 600, 102 S.Ct. 1957, 1960, 72 L.Ed.2d 358 (1982) ("Passing references and isolated phrases are not controlling when analyzing a legislative history."); Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979) (in analyzing legislative history, remarks of single legislator (even sponsor) are not controlling, and must be considered along with reports of both Houses and statements of other Congressmen).
 
 
 [3]
 The majority reliance on Teamster's Local 71 v. NLRB, 553 F.2d 1368 (D.C.Cir.1977), is misplaced. It understandably held that a mixed-guard union could not picket for the purpose of obtaining certification barred to it by Sec. 9(b)(3). The court carefully noted, "However, it is not inconsistent for the Board to allow an incumbent non-qualifying union to appear on the ballot where a qualifying union has petitioned for an election." Id., 553 F.2d at 1376 n. 29. (Emphasis in original). In the present case we are dealing with an incumbent mixed-guard union that has been recognized in the past by Wells-Fargo as the authorized bargaining representative of its guard employees
 
 
 [4]
 ALJ Itkin observed:
 "I note that, although Local 820 only represented 'guard employees', there is no real dispute here that, because of its affiliation with the Teamsters International, it would at all times pertinent to this sequence be treated under Section 9(b)(3) as a so-called mixed guard Union."
 
 
 [5]
 The testimony of Hughes that Local 807 was picketing one of Wells-Fargo's customers, Payomatic, proved to be totally incorrect. It was controverted by the testimony of another Wells-Fargo employee, John Isaacs, and union officials--whose testimony ALJ Itkin credited--that the picketing was not of Payomatic but of Rapid Armored, which was not a customer of Wells-Fargo but happened to be located close to the same site as Payomatic. It is not disputed that Local 807, under its contract with Wells-Fargo, had the right to picket Rapid Armored